**GRAPHIC ARTS MUTUAL INSURANCE COMPANY,**
Plaintiff,

v.

**ESSEX INSURANCE COMPANY, a Division of Markel Corporation,**
Defendant.

**No. CIV.A. 04CV3355TCB.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 8, 2006.

1291

Angela M. Hurley, Christopher D. Balch, Michael P. Carestia, Swift Currie McGhee & Hiers, Atlanta, GA, for Plaintiff.

Daniel C. Norris, Gerald Lamar Mize, Jr., Tiffany L. Powers, Stephen L. Bracy, Alston & Bird, LLP, Atlanta, GA, for Defendant.

## ORDER

BATTEN, District Judge.

This case, which is before the Court on cross-motions for summary judgment, involves a dispute regarding the allocation of defense and indemnity costs between two insurance companies that provided coverage for the same loss.

## I. Background

Crossroads Villa, Ltd. is the owner of the Crossroads Villa Apartments in Savannah, Georgia. On January 1, 1997, Crossroads entered into a property management agreement (the "PMA") with Woodruff Property Management Company, pursuant

to which Woodruff managed and maintained the apartment project.

Article X of the PMA required Crossroads to obtain liability insurance naming Crossroads as the primary insured and Woodruff as an additional insured.

Crossroads purchased a commercial general liability ("CGL") policy from Defendant Essex Insurance Company. Woodruff was not expressly named as an additional insured on this policy. However, the policy did cover Woodruff as an insured: Section II, entitled "Who Is an Insured," states in paragraph (2)(b) that "any organization while acting as your real estate manager" is an insured.

In addition, Woodruff purchased its own liability policy from Plaintiff Graphic Arts Mutual Insurance Company. Crossroads was not an insured under the Graphic Arts policy.

One of the tenants at the Crossroads Apartments was Latoyia Groover. On August 26, 1998, her sixteen-month-old daughter fell through the vertical pickets on a second-story porch railing and was seriously injured.

On August 23, 2000, Ms. Groover filed a lawsuit in the Superior Court of Chatham County, Georgia, against Crossroads and Woodruff, alleging that they were jointly and severally liable for the child's injuries. In this action, Ms. Groover sought to recover the child's medical expenses resulting from the fall.

Essex received notice of the claim[1] and assigned it to Kimberly Payne, a senior claims adjuster. On behalf of Essex, Payne retained counsel, Clay Ratterree, to defend both Crossroads and Woodruff.

On September 5, 2000, Ken Browne, a Graphic Arts claims adjuster, sent a letter to Payne requesting that Essex "instruct the defense counsel assigned to handle this matter on your insured's behalf, also file an answer on behalf, and defend the interest, of Woodruff Management Company." Browne also asked Essex to "accept and acknowledge this tender of the defense of the entire matter," and requested that Payne notify him if Essex could not comply with his request. Neither Payne nor anyone else on behalf of Essex responded to Browne's letter.

After a period of inactivity, Groover filed a second complaint on June 27, 2003, against Woodruff and Crossroads. This action sought to recover the same damages claimed in the first action—the child's medical expenses—as well as all other personal injury damages arising from the accident, e.g., the child's pain and suffering.

On July 22, 2003, Payne sent a letter to Tammye Woods of Graphic Arts, notifying Graphic Arts of Groover's new lawsuit. The letter also proposed that the costs of defense be divided 75/25, with Essex paying three-fourths of the cost and Graphic Arts paying one-fourth. The letter stated that Payne would direct Ratterree to send his bills to Graphic Arts, who would pay twenty-five percent. Graphic Arts contends that Essex never sent these bills, but Essex argues that its counsel sent Graphic Arts' counsel a detailed spreadsheet itemizing and summarizing all of Essex's defense fees, costs and expenses on or about July 5, 2005. Graphic Arts did not respond to Payne's letter.

On January 20, 2004, Ms. Groover dismissed her first complaint, and on March 4, 2004, she renewed it by filing a third complaint against Woodruff and Crossroads. In October 2004, a mediation of Groover's second and third complaints was scheduled for Tuesday, October 19, 2004.

On Thursday, October 14, Payne sent an e-mail to George Mahon, a Graphic Arts litigation specialist, to confirm Essex's re-

---

**1.** It is unclear when and from whom Essex received notice of the claim.

quest made in a teleconference earlier that day that Graphic Arts participate in the anticipated settlement of the Groover case on a 50/50 basis.

On Monday, October 18, Mahon replied to Payne's e-mail and refused to agree to a 50/50 split, indicating that Graphic Arts would "participate in settlement with a 25% contribution."

Payne replied to this e-mail that same day, indicating that Essex did not agree to a 75/25 split of settlement costs.

The next day, Tuesday, October 19, Steve Yacco, a home claims examiner for Graphic Arts, e-mailed Payne and wrote that "each policy will be deemed co-primary ... with each carrier obligated to provide 50% of coverage [for Woodruff]."

In order to allow the mediation to go forward, the parties agreed to split the indemnity on a 50/50 basis pursuant to a reservation of rights agreement. The mediation was successful, with the Groover case settling for $785,000. Both Graphic Arts and Essex contributed an equal share, or $392,500. However, Graphic Arts did not contribute any money towards the defense of the Groover case, the total cost of which was $186,689.96.

On November 16, 2004, Graphic Arts filed this action against Essex, seeking to recover some or all of the $392,500 that it paid to settle the Groover case. Graphic Arts contends that its policy constitutes excess insurance and, as such, it was not obligated to contribute to the settlement because Essex's policy limits were not exhausted. Alternatively, Graphic Arts asserts that it is liable for no more than one-fourth of the total settlement paid, or $192,250.

In its amended answer and counter-claim, Essex contends that Graphic Arts' policy was excess, not primary, and that Graphic Arts was required to provide a defense for Woodruff. Essex contends that Graphic Arts is not entitled to recover any of the $392,500 it contributed to settle the Groover case. Essex also seeks reimbursement of half of the defense costs it incurred for the defense of Woodruff, or $93,344.98.

## II. Summary Judgment Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

## III. Discussion

### A. Whether the Graphic Arts Policy Provides Primary or Excess Coverage

Both parties agree that the Essex policy provided primary coverage to Woodruff

for the Groover claim, but dispute whether the Graphic Arts policy also provided primary coverage. Accordingly, the Court must first determine whether the policy issued by Graphic Arts to Woodruff provided primary or excess coverage.

Graphic Arts argues that if its policy provides excess coverage, then it is entitled to reimbursement of the money it paid towards settlement of the Groover case because Essex's $1,000,000 policy limits were not exhausted. By contrast, Essex argues that if the Graphic Arts policy provides primary coverage, Graphic Arts was required to contribute to the loss.

■ Where two or more insurers cover the same risk, courts examine the language in the "other insurance" clauses to determine whether each policy is primary or excess with respect to the covered claim. *See, e.g., Allstate Ins. Co. v. Employers Liab. Assurance Corp.,* 445 F.2d 1278, 1283 (5th Cir.1971).

Essex argues that the plain language of the "other insurance" clause in the Graphic Arts policy requires a finding that the Graphic Arts policy provides primary, not excess coverage, with respect to Groover's claim. Essex points to section IV, paragraph 4(a) of Graphic Arts' policy, which states that coverage is primary except when any of the circumstances listed in subsection (b) apply. Graphic Arts relies upon subsection (b)(2), which provides that its policy is excess over "Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which [Woodruff has] been added as an additional insured by attachment of an endorsement."

Essex contends that subsection (b)(2) is not satisfied because Woodruff was not added to the Essex policy as an additional insured by attachment of an endorsement. Graphic Arts replies that the intent of subsection (b)(2) was to make the Graphic Arts policy excess if the insured (Woodruff) was covered by another policy, and that it does not matter whether the insured was specifically added as an additional insured by attachment of an endorsement.

■ Where the terms of a contract are clear, unambiguous, and capable of but one reasonable interpretation, courts will look to the contract alone to find the intent of the parties. *See, e.g., Rice v. State Farm Fire & Cas. Co.,* 208 Ga.App. 166, 170, 430 S.E.2d 75, 78 (1993). Additionally, Georgia law instructs that, where possible, each and every term of an insurance contract be given meaning and effect. *See, e.g., Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 269 Ga. 326, 327–28, 498 S.E.2d 492, 494 (1998).

■ Applying general principles of contract law, the Court finds that Essex is correct. To constitute excess coverage, the plain language of the Graphic Arts policy required Woodruff to be added to the Essex policy as an additional insured by attachment of an endorsement. It is undisputed that the Essex policy did not name Woodruff as an additional insured by attachment of an endorsement.

Without citing to authority, Graphic Arts asserts that attaching an endorsement is a "ministerial obligation." According to Graphic Arts, the distinction between explicitly naming a third party an additional insured by an endorsement and defining "Who Is an Insured" broadly enough to include that third party is not legally significant; either way, the policy covers the third party.

Contrary to Graphic Arts' position, the requirement that an entity be added as an additional insured by endorsement is an important consideration that can affect the insurer's basic coverage obligations. In a treatise interpreting the same language that is contained in subsection (b)(2) of the

Graphic Arts policy, the author states as follows:

> [T]his prioritizing of coverage [under subsection (b)(2)] applies only to another CGL under which the named insured has additional insured status by means of *an endorsement.* Insured status under another policy can be stated as a basic condition of the policy itself. A CGL named insured can also be an insured under another policy as a partner or joint venturer, as an officer, director of stockholder, as a real estate manager, or in a number of other capacities defined in the policy's "Who Is an Insured" section. Insured status in any of these forms would not trigger the provision of the current CGL "Other Insurance" clause [subsection (b)(2)] because such insured status is not created *by endorsement.*

Patrick J. Wielinski, et al., *Contractual Risk Transfer: Strategies for Contract Indemnity and Insurance Provisions* § XI.C. 18–19 (International Risk Management Institute, Inc.2006) (emphasis in original).

In order for excess coverage to apply, the Graphic Arts policy plainly required Woodruff to be named as an additional insured in another policy by attachment of an endorsement, a requirement that was not met here. Woodruff may have been insured under the Essex policy pursuant to Section II(2)(b), which defines as an insured "any organization while acting as your real estate manager," but Woodruff was not named as an additional insured by attachment of an endorsement. Graphic Arts drafted the "other insurance" provision in its policy, and it cannot ignore the plain meaning of that provision to escape liability as a co-primary insurer for the Groover claim.

Graphic Arts also argues that it is immaterial that Woodruff was not added to the Essex policy as an additional insured by attachment of an endorsement because Article X of the PMA required Crossroads to obtain insurance coverage that named Woodruff as an additional insured.

The Court rejects this argument. For the purposes of this action—a dispute between two insurers—the relevant contract is the insurance contract, not the contract between the two insureds requiring one of them to obtain insurance. Essex is not a party to the PMA, and the terms of that contract have no bearing on whether Woodruff was, in fact, added to the Essex policy as an additional insured by an attachment of an endorsement. *See* Allan D. Windt, *Insurance Claims and Disputes* § 11:30 (4th ed.2006) ("[a]n insurer's duties are defined by what it contracted to do, not by what the insured contracted to do").

For all of these reasons, the Court concludes that the Graphic Arts policy provided co-primary coverage to Woodruff for the Groover claim.

## B. Graphic Arts' Other Arguments Against Contributing to Settlement and Defense Costs

Raising several different theories, Graphic Arts argues that even if its policy provided co-primary coverage, it is not obligated to share in the costs of settling or defending the Groover action.

### 1. The PMA's Indemnity Provision

First, Graphic Arts argues that it does not have to pay any of the settlement or defense costs because Crossroads had a duty to indemnify Woodruff pursuant to the PMA. Article VIII of the PMA, states as follows:

> [Crossroads] shall save [Woodruff] harmless from all damages, suits in connection with the management of the herein described property, and from liability for injuries suffered by any on-site

personnel where such damages or injury is the direct result of the sole negligence or willful action of Owner. Owner must have necessary public liability insurance adequate to protect the interest of the parties hereto.

Essex argues that the indemnity language is inapplicable here because it is included under the "Employees" section of the PMA, which deals primarily with the hiring and payment of on-site personnel. Essex further contends that Crossroads only agreed to indemnify Woodruff for certain actions that were the result of the "sole negligence or willful action" of Crossroads. Because the Groover case did not allege injuries that were the result of the "sole negligence or willful action" of Crossroads, Essex argues that the indemnity provision in the PMA is inapplicable as a matter of law. The Court agrees with Essex and finds that the indemnity provision is inapplicable as a matter of law.

█ Under Georgia law, indemnity provisions are strictly construed against the indemnitee, here Woodruff. *See, e.g., Westinghouse Elec. Corp. v. Williams*, 183 Ga.App. 845, 846, 360 S.E.2d 411, 413 (1987). The Groover action was not a suit for damages arising from the "management" of the property, and Groover's child was not "personnel," i.e., an employee. Moreover, the Groover suit did not allege that Crossroads was solely negligent. In sum, Article VIII of the PMA does not clearly manifest the parties' intention to absolve Woodruff from liability in a case such as this. For all of these reasons, Crossroads does not have a duty to indemnify Woodruff.

### 2. Graphic Arts' Alleged Tender of the Defense

Graphic Arts also contends that it properly tendered the defense of the Groover case in Browne's September 5, 2000 letter to Payne. Neither Payne nor anyone else at Essex responded to this letter.

Graphic Arts argues that (1) Essex's lack of a response to the tender constitutes an acceptance of the tender, and (2) Essex's failure to send a reservation of rights letter to Graphic Arts after receiving this tender precludes Essex from refusing to indemnify Woodruff for the settlement costs and from seeking contribution to the defense costs.

Essex argues that Graphic Arts' decision to tender the defense does not obviate Graphic Arts' obligation to contribute to the defense costs. Essex contends that there is no authority for the proposition that an insurance company must send a reservation of rights letter to another insurance company to preserve a claim for contribution against that insurer. Essex further argues that even if a reservation of rights letter was required, Essex was not able to send one because it could not evaluate its coverage obligations in light of Graphic Arts' refusal to provide basic information to Essex indicating the two insurers' respective rights and obligations.

█ The Court finds that Essex's failure to respond to Graphic Arts' September 5, 2000 letter neither indicated nor constituted acceptance of the tender. The circumstances of the case were such that there was a period of inactivity from the date of the filing of the initial complaint, August 23, 2000, until Ms. Groover filed her second complaint on June 27, 2003. Shortly after this complaint was filed, on July 22, 2003, Payne of Essex sent a letter to Woods of Graphic Arts attempting to obtain some contribution to the defense costs.

In light of the fact that Essex sent a letter in 2003 seeking contribution from Graphic Arts, in conjunction with the fact that there was a prolonged period of inactivity in the Groover case, it is apparent

that Essex did not accept any alleged tender of the case by Graphic Arts. Under these circumstances, the Court rejects Graphic Arts' argument that its alleged tender somehow obviates its obligation as a co-primary insurer to contribute to the settlement and defense costs.

### 3. Essex's Contractual Duty to Defend Woodruff as an Insured under the Essex Policy

■ Finally, Graphic Arts argues that Essex is not entitled to any contribution towards the defense of Woodruff because Essex had a duty to defend Woodruff since Woodruff was an insured under the Essex policy. According to Graphic Arts, an insurer is not entitled to contribution for defense of its own insured.

To support this argument, Graphic Arts relies upon *Barton & Ludwig, Inc. v. Fidelity & Deposit Co. of Maryland,* 570 F.Supp. 1470, 1472 (N.D.Ga.1983), in which the court found that absent a contractual arrangement to the contrary, an insurer is not entitled to contribution for defense of its own insured. Graphic Arts argues that since there is no contractual agreement between it and Essex, Graphic Arts is under no obligation to contribute towards the costs of defending Woodruff.

Essex counters that *Barton* does not apply because a specific contractual agreement does exist in this case—the almost identical "other insurance" clauses in the Essex and Graphic Arts policies. The "other insurance" clauses provide for a method of sharing the amount of the loss when there is more than one primary insurer.

The Court finds that the "other insurance" clause contained in both policies, specifically the "method of sharing" subsection, constitutes a sufficient contractual arrangement to allow Essex to seek contribution from Graphic Arts. *Barton* is therefore inapposite, and Essex is not precluded

from seeking contribution from Graphic Arts for defense costs. *Accord Nationwide Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 122 N.C.App. 449, 454–55, 470 S.E.2d 556, 559 (1996) (insurer had right of contribution for defense costs against co-insurer stemming from language in "other insurance" clause); *Liberty Mut. Ins. Co. v. U.S. Fid. & Guar. Ins. Co.,* 756 F.Supp. 953, 957 (S.D.Miss.1990) (insurer could recover one half of defense costs expended from co-insurer that refused to defend pursuant to "equal shares" language in policy).

### C. Division of Settlement and Defense Costs Between Graphic Arts and Essex

Having found that both policies are primary and that Graphic Arts is not otherwise relieved of its duty to contribute to the defense and settlement costs, the next issue is how to properly allocate the loss between the two primary insuring parties.

Essex argues that the parties are required by their respective policies to contribute to the loss in equal shares. Graphic Arts contends that the division should be 75/25, with Graphic Arts bearing the smaller percentage.

### 1. The Policies' "Other Insurance" Provisions

■ Essex points out that both the Essex and Graphic Arts policies have almost identical "other insurance" provisions, which provide that if both policies are primary, the insurers will share with all other insurance in "equal shares." Indeed, Section IV.4.c of both policies provides:

> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable

limit of insurance or none of the loss remains, whichever comes first.

According to Essex, in keeping with the plain language of the policies, the insurers are required to contribute to the defense and settlement costs in "equal shares," and Essex and Graphic Arts are therefore required to split the amount of the total loss for the Groover case on a 50/50 basis.

Graphic Arts argues that it should only be required to pay twenty-five percent of the total loss because it only insured one of the defendants (Woodruff), whereas Essex insured both defendants (Woodruff and Crossroads). In other words, Graphic Arts asks the Court to view liability under the Groover complaint as a pie chart, half of which represents Crossroads's liability and the other half Woodruff's liability. And because Graphic Arts only insured Woodruff, Graphic Arts argues it should only be required to pay half of Woodruff's liability, or twenty-five percent of the total loss. Concomitantly, Graphic Arts asserts that Essex, as the sole insurer of Crossroads and a co-primary insurer of Woodruff, is responsible for one-hundred percent of Crossroads's liability and fifty-percent of Woodruff's liability, thereby making Essex responsible for seventy-five percent of the total loss.

According to Graphic Arts, any other division would be "inequitable and illogical" because it would require Graphic Arts to contribute towards Crossroads's indemnity and defense. However, Graphic Arts has cited to no case law that dictates the result it proposes or in any way supports its theory.

By contrast, Essex and the Court have located several cases that, while not controlling, do indicate that "equal shares" language in "other insurance" provisions are to be enforced irrespective of the number of insureds or other extraneous factors. *See, e.g., McDaniels v. Great Atl. & Pac. Tea Co.*, 602 F.2d 78, 83 (5th Cir. 1979) (rejecting argument by one insurer that loss should be apportioned on a pro rata basis instead of in equal shares, holding that "[a]pportionment of the loss between Ranger and Aetna is governed exclusively by the terms of their respective policies regarding other insurance"); *Aviles v. Burgos*, 783 F.2d 270, 282 (1st Cir.1986) ("CIS makes some suggestion that it would be more equitable to have contribution pro rata given the greater coverage of the Travelers policy and the greater premiums paid to Travelers, but we see no room for such equity where the language of the CIS policy clearly states that the contribution should be on the basis of equal shares"); *Fire Ins. Exchange v. Am. States Ins. Co.*, 39 Cal. App.4th 653, 46 Cal. Reptr.2d 135, 139–40 (Cal.App.1995) (upholding trial court's use of equal proration in allocating liability under two insurance policies applicable to same loss, notwithstanding that only one of the three underlying defendants was insured under one policy while all three were insured under the other policy); *Am. Empire Ins. Co. v. PSM Ins. Cos.*, 259 A.D.2d 341, 687 N.Y.S.2d 32, 33–34 (N.Y.App.Div. 1999) (where plain language of policies specified allocation by equal shares, insurers could not prorate indemnity based upon policy limits or time on the risk); *see also Colony Ins. Co. v. Pinewoods Enters., Inc.*, 29 F.Supp.2d 1079, 1084 (E.D.Mo. 1998).

Additionally, the Court has other concerns with Graphic Arts' argument. Graphic Arts' position assumes that Woodruff, as one of two defendants, would be responsible for exactly fifty-percent of the claim. However, this assumption is unsupported by any evidence. Ms. Groover's complaint alleged that Crossroads and Woodruff were liable as joint tortfeasors. The Groover case settled before trial, without any judgment or apportionment of liability. Thus, it is possible that Woodruff

could have been found solely liable for the loss, just as it is possible that Crossroads could have been found solely liable. There are myriad potential scenarios. In short, a 50/50 split was possible, but no more or less possible than any of the other potential outcomes.[2]

Graphic Arts' position therefore requires the Court to speculate and assume what the allocation of liability would have been had the case not settled. The Court declines to do so. The plain language of the policies—not speculation—governs the necessary allocation of the loss in this case, with each insurer paying "equal shares" of the "loss."

Graphic Arts had a duty to contribute to the settlement in an equal share by paying fifty-percent of the total indemnity payment, or $392,500. For the same reasons, Graphic Arts also had a duty to contribute fifty-percent of the total defense costs, or $93,344.98. *See Fed. Ins. Co. v. Cablevision Sys. Dev. Co.*, 836 F.2d 54, 58 (2d Cir.1987) (equal shares provision for indemnity required insurers to split defense costs in equal shares as well).

Accordingly, Graphic Arts is not entitled to recover any of the amount it already paid towards indemnity. However, Graphic Arts did not contribute to the defense of the underlying lawsuit, and Essex is entitled to recover from Graphic Arts half of the costs of defending the action, or $93,344.98.

## 2. Promissory Estoppel

In a last ditch attempt to preclude Essex from recovering defense and settlement costs in excess of twenty-five percent, Graphic Arts raises a promissory estoppel claim. In support thereof, Graphic Arts relies upon a July 22, 2003

letter in which Payne, on behalf of Essex, wrote to Woods of Graphic Arts, proposing that the defense costs be divided 75/25, with Essex paying three-fourths of the costs and Graphic Arts paying one-fourth. Graphic Arts argues that Essex is now estopped from arguing a division of defense costs in any proportion greater than the amount proposed in the letter.

To prevail on a promissory estoppel claim, the plaintiff must show that (1) the defendant made certain promises, (2) the defendant should have expected that the plaintiff would rely on such promises, (3) the plaintiff did in fact rely on such promises to their detriment, and (4) injustice can be avoided only by enforcement of the promise. O.C.G.A. § 13–3–44(a).

Graphic Arts argues that Payne's letter meets these elements because Payne made a promise that was intended to induce action or forbearance on the part of Graphic Arts. It also argues that it relied on the promise to its detriment because it proceeded with the case with the understanding that it would be liable for one-fourth of any defense costs and one-fourth of any eventual settlement, but then had to pay half of the settlement costs. Graphic Arts did not receive notice that Essex would not agree to a 75/25 split until shortly before the mediation.

The Court rejects Graphic Arts' promissory estoppel argument because it did not rely on Payne's promise to its detriment. Payne's promise did not induce any action or forbearance on the part of Graphic Arts. Graphic Arts never responded to Payne's letter, and the money that Graphic Arts paid towards the settlement in excess of what it expected to pay was subject to a reservation of rights

---

**2.** Graphic Arts also asserts that under Georgia Rule of Professional Conduct 1.7, "It would have been a conflict of interest for [defense counsel] to represent both parties if

they were not equally liable." Contrary to Graphic Arts' argument, Rule 1.7 does not support such a sweeping interpretation.

agreement. Furthermore, Graphic Arts did not contribute any money towards defense costs. Accordingly, Graphic Arts' promissory estoppel claim fails as a matter of law.

### D. Graphic Arts' Claims for Unjust Enrichment and Attorney's Fees

In light of the Court's disposition of the issues highlighted above, Graphic Arts' claims for unjust enrichment and attorney's fees fail as a matter of law.

## V. Conclusion

For the foregoing reasons, the Court concludes that the Graphic Arts policy provides primary coverage for the Groover claim and that Graphic Arts was required to participate in the defense and settlement of the claim in equal shares with Essex. Consequently, the Court **GRANTS** Essex's motion for summary judgment [43] and **DENIES** Graphic Arts' motion for summary judgment [49]. The **CLERK is DIRECTED** to enter judgment in favor of Essex and against Graphic Arts in the amount of $93,344.98, and close this case.