## A04A1232. SAWHORSE, INC. v. SOUTHERN GUARANTY INSURANCE COMPANY OF GEORGIA.
(604 SE2d 541)

RUFFIN, Presiding Judge.

SawHorse, Inc., a residential home renovation and construction company, brought a declaratory judgment action against its insurer, Southern Guaranty Insurance Company of Georgia ("Southern Guaranty"), seeking resolution of a claims dispute under its general commercial liability policy. SawHorse also demanded damages from Southern Guaranty for bad faith failure to pay and unjust enrichment, as well as attorney fees. Southern Guaranty moved for summary judgment, asserting that the policy did not cover SawHorse's claim. The trial court granted Southern Guaranty's motion, and SawHorse appeals.[1] For reasons that follow, we affirm in part and reverse in part.

Summary judgment is appropriate when no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law.[2] We review the trial court's grant of summary judgment de novo, construing the evidence and all reasonable conclusions and inferences in favor of the nonmovant.[3]

Viewed in this manner, the record shows that, on April 10, 2000, SawHorse entered into a contract with JoAnne Hall and Terrie Rooks to renovate a house owned by Hall and Rooks. The Hall-Rooks job involved the addition of a new second floor onto an existing one-story house. The contract also provided for

> [f]irst floor renovations consist[ing] of lowered ceilings inside and outside of [the] front entry; patched ceilings where skylights are located; [a] lowered ceiling in [a portion] of [the] walk-in closet[;] replacement of [the] front entry and basement stair flooring material[;] [and] [r]enovations to [the] existing first floor exterior facade.

---

[1] The trial court also denied SawHorse's cross-motion for partial summary judgment, but that ruling is not enumerated as error on appeal.

[2] See *Nationwide &c. Ins. Co. v. Erwin,* 240 Ga. App. 816, 817 (525 SE2d 393) (1999).

[3] See id.

Because Hall and Rooks wanted to live in their home during construction of the second-floor addition, a SawHorse architect developed a plan for building the second story without significantly disturbing the first-floor roof. SawHorse then retained Mike Quinn, a structural engineer, to design "the structural aspects of the renovation."

Quinn's design required workers to " 'break[ ]' " the first-floor roof and install support beams. The design drawings, however, failed to clearly mark and identify these support beams, and DutchCraft, the SawHorse subcontractor responsible for carrying out Quinn's design, did not install the necessary beams. As a result, the second floor construction began to " 'sag' " in September 2000. This problem caused significant damage to the addition, including sagging floor joists, walls that needed repair, and uneven hardwood floors. Dutch-Craft also failed to properly install a rear support beam that was clearly marked in Quinn's drawings, causing further damage to the new structure. In addition to the damage to the second-floor construction, Hall and Rooks claimed that DutchCraft's failure to install the support beams damaged the existing structure of the original one-story home.

SawHorse incurred costs exceeding $41,000 in attempting to repair the damage, and in November 2000, it sought reimbursement for such expenses under its general commercial liability policy with Southern Guaranty. The insurance company denied coverage.

In January 2002, SawHorse sued Hall and Rooks, alleging that the homeowners had not fully paid for the renovation. Hall and Rooks answered and counterclaimed on February 27, 2002. They alleged that SawHorse failed to properly construct the renovation, negligently attempted to repair certain defects, negligently designed the renovation, and committed fraud.

Approximately six weeks later, SawHorse filed the instant action against Southern Guaranty. It sought a declaration of coverage for all expenses relating to the damage at the Hall-Rooks home. SawHorse also alleged claims for bad faith failure to pay, unjust enrichment, and attorney fees. Southern Guaranty subsequently moved for summary judgment, asserting that the damage was not covered under the policy. The trial court agreed and granted Southern Guaranty's motion.

1. " 'In Georgia, insurance is a matter of contract, and the parties to an insurance policy are bound by its plain and unambiguous terms.' "[4] Although such contracts are construed against the insurer if the provisions are susceptible to more than one interpretation, " 'if

---

[4] *Sapp v. State Farm &c. Co.*, 226 Ga. App. 200, 201 (1) (a) (486 SE2d 71) (1997).

the language is unambiguous and but one reasonable construction is possible, the court will enforce the contract as written.' "[5]

SawHorse's general commercial liability policy obligates Southern Guaranty to pay "those sums that [SawHorse] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which [the] insurance applies." The policy contains numerous exclusions, including the following, listed in subsection j:

> This insurance does not apply to . . . "[p]roperty damage" to . . . (5) [t]hat particular part of real property on which [SawHorse] or any contractors or subcontractors working directly or indirectly on [SawHorse's] behalf are performing operations, if the "property damage" arises out of those operations; or (6) [t]hat particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. . . . Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

The policy defines "your work" as, among other things, "[w]ork or operations performed by [SawHorse] or on [SawHorse's] behalf." The "products-completed operations hazard" includes " 'property damage' occurring away from premises [SawHorse] own[s] or rent[s] and arising out of . . . 'your work' except . . . [w]ork that has not yet been completed or abandoned."

The exclusions in subsection j are known as "business risk" exclusions and "are designed to exclude coverage for defective workmanship by the insured builder causing damage to the construction project itself."[6] As we have noted:

> There are two kinds of risks that are incurred by a contractor. The first is the business risk borne by the contractor to replace or repair defective work to make the building project conform to the agreed contractual requirements. This type of risk is not covered by the [Southern Guaranty] policy, and the business risk exclusions in the policy make this clear. The second is the risk that the defective or faulty workmanship will cause injury to people or damage to other property. Because of the potentially limitless liability associated with this risk, it is the type for which . . . commercial general liability coverage is contemplated. . . . The risk intended to

---

[5] Id.
[6] Id. at 202-203.

be insured is the possibility that the . . . work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the . . . completed work itself, and for which the insured may be found liable.[7]

On appeal, SawHorse focuses on two types of damage: (a) damage to the Hall-Rooks second-floor addition caused by DutchCraft's failure to install necessary support beams; and (b) damage to the existing one-story structure. The trial court found that the business risk exclusion in subsection j (6) excluded *all* of this damage from coverage under the policy.

(a) *Damage to the second-floor addition.* SawHorse argues that questions of fact remain as to whether subsection j (6) excludes coverage for the second-floor damage. Specifically, it claims that a jury question exists as to whether the work was completed or abandoned at the time this damage occurred, bringing the damage within the "products-completed operations hazard."

The "products-completed operations hazard" includes property damage occurring away from premises owned or rented by SawHorse and arising out of work completed or abandoned by SawHorse. According to SawHorse, Southern Guaranty has not shown that any property damage resulted on the second-floor addition before SawHorse completed or abandoned the project. We disagree.

The record shows that the project was ongoing when a lack of proper support beams caused the second-story flooring to sag in September 2000. The lack of support beams and sagging floors, in turn, "caused significant damage to the newly-built second floor addition." The record thus shows that the damage to the second-floor addition occurred before the missing support beams were installed by SawHorse, which had its subcontractors " 'slide' the support beam[s] underneath the existing structure to 'true-up' the second floor addition, and then undertake significant repairs on the second floor structure."

Under the policy, work is deemed completed at the earliest of: (a) when the work called for in the contract has been completed; (b) when the work to be performed at the job site has been completed if the contract calls for work at more than one job site; or (c) when the work has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project. The policy further provides that "[w]ork that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

---

[7] (Punctuation and emphasis omitted.) Id. at 203-204 (1) (b).

SawHorse apparently contends that its remedial work on the second floor constituted correction or repair of an otherwise finished project. But it defies logic to conclude that a second-story structure lacking necessary support beams is "complete" under the policy. And SawHorse has presented no evidence that, prior to the addition of the support beams, the renovation was available for its intended use. Furthermore, although SawHorse asserts that it stopped work on and arguably abandoned the project in January 2001, it certainly had not abandoned the project when it added the support beams. Finally, SawHorse has not pointed to any evidence that the second floor incurred damage after it installed the required beams.

The "products-completed operations hazard" does not remove SawHorse's claim for damage to the second-floor addition from the business risk exclusion in subsection j (6). And we agree with the trial court that the risk associated with repairing this type of damage, which resulted directly from faulty workmanship, is specifically excluded by that subsection.[8] Such repair work was necessary to make the second-floor renovation conform to the contract between SawHorse and Hall and Rooks. Because this damage was a risk borne by SawHorse and excluded by the policy,[9] the trial court properly granted Southern Guaranty summary judgment as to this portion of the claim.[10]

(b) *Damage to the existing one-story structure.* SawHorse also seeks coverage for damages to the existing first-floor structure that Hall and Rooks allege resulted from the faulty workmanship. On appeal, Southern Guaranty argues that the business risk exclusions in subsections j (5) and j (6) exclude this claim as a matter of law. We disagree.

According to Southern Guaranty's summary judgment brief, the damage to the existing structure includes faulty work actually performed by SawHorse or its subcontractors on the first floor. The brief also notes, however, that the Hall-Rooks claim involves structural damage, such as a crack on the basement floor, which might be related to the second-floor addition.

Although SawHorse's construction contract shows that Hall and Rooks hired SawHorse to perform some renovation work on the first

---

[8] See id. (damages relating directly to cost of repairing or replacing allegedly negligent work excluded under business risk exclusion); see also *Bituminous Cas. Corp. v. Northern Ins. Co. of New York*, 249 Ga. App. 532, 534 (548 SE2d 495) (2001) (general contractor's claim under commercial general liability policy for damages resulting from contractor's effort to repair faulty workmanship excluded under business risk exclusion).

[9] See *Sapp*, supra at 203-204.

[10] SawHorse does not challenge, and thus we need not address, the trial court's conclusion that subsection j (6) applies to work performed for SawHorse by a subcontractor.

floor, it is not clear whether all of the alleged first-floor damage occurred in the areas where SawHorse was performing work. Furthermore, we have not found, and neither party has cited, any *evidence* detailing the damage to the first floor, its cause, or when it occurred. The parties point only to the statements in Southern Guaranty's summary judgment brief. We thus cannot determine whether — or to what extent — the allegedly defective workmanship caused damage to the construction project itself, a business risk borne by the contractor, or to other property, a risk covered by SawHorse's general commercial liability policy.[11] Under these circumstances, questions of fact remain as to coverage for property damage to the first-floor structure, rendering summary judgment on this portion of SawHorse's claim improper.[12]

2. Southern Guaranty argues that, even if the business risk exclusions do not apply, summary judgment is appropriate on several other grounds. Because questions of fact remain as to whether the business risk exclusions apply to the first-floor damage, we will address these alternative arguments.

(a) First, Southern Guaranty claims that, as a matter of law, damages resulting from defective or negligent construction do not constitute "property damage." The policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." We cannot discern how physical injury to the first floor of the Hall-Rooks home falls outside of this definition. The fact that certain property damage arising from defective or negligent construction is excluded from coverage does not place all of this damage outside of the term "property damage." In fact, the exclusions refer to such damage as "property damage." Accordingly, this argument lacks merit.

(b) Second, Southern Guaranty argues that there has been no "occurrence" within the meaning of the policy. Coverage only extends to " 'property damage' [that] is caused by an 'occurrence.' " The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Although the policy does not define "accident," under Georgia law, that term means "an event which takes place without one's foresight or expectation or design."[13]

---

[11] See *Sapp*, supra; see also *Canal Indem. Co. v. Blackshear Farmers &c.*, 227 Ga. App. 637, 639 (2) (490 SE2d 129) (1997) (business risk exclusions "are designed to exclude coverage for defective workmanship by the insured causing damage to the project itself. [Cit.] The risk that defective or faulty workmanship will damage other property is the type of risk for which comprehensive general liability coverage is contemplated.") (punctuation omitted).

[12] See id. at 639-640.

[13] OCGA § 1-3-3 (2).

Southern Guaranty has cited no Georgia authority supporting its apparent claim that faulty workmanship cannot constitute an "occurrence" under a general commercial liability policy. And this claim runs counter to case law finding that policies with similar "occurrence" language provide coverage for "the risk that . . . defective or faulty workmanship will cause injury to people or damage to other property."[14] Furthermore, Southern Guaranty has pointed to no evidence that SawHorse intended for the faulty workmanship to occur.[15] Under these circumstances, Southern Guaranty is not entitled to summary judgment based on the "occurrence" language in the policy.

(c) Finally, Southern Guaranty argues that SawHorse failed to provide the insurer with timely notice of the claim. The record shows that, in November 2000, SawHorse notified Southern Guaranty of the problems with the second-floor addition, and Southern Guaranty denied SawHorse's insurance claim later that month. This notice, however, is not the basis for Southern Guaranty's argument. Instead, the insurer focuses on the Hall-Rooks counterclaim, which was filed on February 27, 2002, but not forwarded by SawHorse to Southern Guaranty until approximately six months later, in August 2002.

The policy required SawHorse to "[i]mmediately send [Southern Guaranty] copies of any demands, notices, summonses or legal papers received in connection with [a] claim or 'suit.'" According to Southern Guaranty, SawHorse breached this provision and waived coverage by waiting six months to notify the insurer of the Hall-Rooks counterclaim.

Faced with similar insurance clauses, we have construed the term "immediately" to mean "with reasonable diligence and within a reasonable length of time in view of attending circumstances of each particular case."[16] And "whether process was forwarded with reasonable timeliness under all the circumstances is usually a question of fact."[17] The record shows that, although SawHorse did not forward the Hall-Rooks counterclaim to Southern Guaranty until August 2002, it referenced the counterclaim in its complaint filed against Southern Guaranty on April 9, 2002, and it requested coverage for damages and expenses arising out of that litigation. We further note

---

[14] *Glens Falls Ins. Co. v. Donmac Golf Shaping Co.*, 203 Ga. App. 508, 511 (3) (417 SE2d 197) (1992) (note occurrence language supra at 509 (1)).

[15] Compare *City of Atlanta v. St. Paul &c. Ins. Co.*, 231 Ga. App. 206, 207-208 (1) (498 SE2d 782) (1998) (commercial general liability policy that provided coverage for damages caused by an "event" did not cover claim allegedly arising out of intentional trespass because such a trespass was not an "event," which the policy defined as "an accident").

[16] *Bituminous Cas. Corp. v. J. B. Forrest & Sons, Inc.*, 132 Ga. App. 714, 719 (2) (209 SE2d 6) (1974).

[17] *Continental Cas. Co. v. Parker*, 161 Ga. App. 614, 618 (2) (288 SE2d 776) (1982).

that, beginning in November 2000, Southern Guaranty denied coverage for damages relating to problems with the second-story addition. Under these circumstances, a question of fact remains as to whether SawHorse acted with reasonable diligence in sending the counterclaim to Southern Guaranty, and Southern Guaranty is not entitled to judgment as a matter of law on this issue.[18]

*Judgment affirmed in part and reversed in part. Eldridge and Adams, JJ., concur.*

DECIDED JULY 30, 2004 —
RECONSIDERATION DENIED SEPTEMBER 9, 2004.

*Stites & Harbison, Robert D. Douglass, Timothy A. Baxter,* for appellant.
*Mabry & McClelland, Richard H. Hill, Jr., Kyler L. Wise,* for appellee.

---

[18] See id. at 617-618 (although insured delayed three months in forwarding suit papers to insurer, question of fact remained as to whether insured complied with requirement that process be forwarded immediately, given insurer's prior oral denial of claim).