## A09A1119. HATHAWAY DEVELOPMENT COMPANY, INC. v. AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY.
### (686 SE2d 855)

BARNES, Judge.
    The issue in this case is whether a general contractor can recover a judgment against its plumbing subcontractor from the insurance company that issued the subcontractor's commercial general liability (CGL) insurance policy. The trial court granted summary judgment to the insurer, and for the reasons that follow, we reverse.
    "What constitutes property damage and an occurrence in the realm of construction defect claims against an insured general contractor for the acts and/or omissions of its subcontractors are perhaps the most litigated insurance issues over the last several years." Lee H. Shidlofsky, "Supreme Court of Texas Weigh-in on Property Damage and Occurrence in the Realm of Construction Defect Claims," 2008 Emerging Issues 1315 (Matthew Bender & Co., Inc.). CGL policies insure nearly all participants in the construction industry, including general contractors, subcontractors, material and equipment suppliers, and public and private project owners. As noted by the Associated General Contractors of America in another case before this court, construction is "fraught with huge risks, the dollar amount of which often exceeds the value of the project itself," and thus commercial insurance is a critical element of construction projects in which substantial exposure is insured against in exchange for significant premiums. The subcontractor's premium for the year preceding these claims, for example, totaled $82,890.
    The parties do not disagree on the underlying facts that gave rise to the claim, only on whether the subcontractor's CGL policy covers the damages for which payment is sought. General contractor Hathaway Development Company hired Whisnant Contracting Company to install the plumbing on three separate construction projects: Walden Legacy, Bartram Springs, and Village Highlands. American Empire Surplus Lines Insurance Company issued a commercial

general liability policy to Whisnant. Problems arose with the plumbing at all three construction sites, and eventually Hathaway sued Whisnant for negligent construction, obtained a default judgment for $187,696, and sought payment from American Empire.[1] American Empire denied liability on several grounds, and the trial court granted summary judgment to the insurer, holding that its insured, Whisnant, failed to give the company notice of Hathaway's suit against it, that Hathaway's claims did not arise out of a covered "occurrence," and that the claims were excluded by the contract terms. Hathaway appeals, arguing that American Empire had sufficient notice of the suit against Whisnant, that the incidents were "occurrences" as defined by the policy for which Whisnant was legally obligated to pay; and that none of the contractual exclusions apply to defeat its claim.

On appeal we review the trial court's grant of summary judgment de novo to determine whether the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a genuine issue of material fact. Summary judgment is proper only when no issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Ford v. Bank of America Corp.*, 277 Ga. App. 708 (627 SE2d 376) (2006). When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence. *Wachovia Bank v. Moody Bible Institute of Chicago*, 283 Ga. App. 488, 489 (642 SE2d 118) (2007). In this State

> [t]he construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*Schwartz v. Harris Waste Mgmt. Group*, 237 Ga. App. 656, 660 (2) (516 SE2d 371) (1999). The existence or nonexistence of an ambiguity is a question of law for the court. *Southeast Atlantic Cargo Operators v. First State Ins. Co.*, 197 Ga. App. 371, 372 (398 SE2d

---

[1] Although Hathaway initially sought payment from American Empire on Whisnant's policy as an "additional insured," the company abandoned that argument on appeal.

264) (1990). If the court determines that an ambiguity exists, however, a jury question does not automatically arise, but rather the court must first attempt to resolve the ambiguity by applying the rules of construction in OCGA § 13-2-2. Id.

1. Hathaway first argues that the trial court erred in granting summary judgment to American Empire based on Whisnant's failure to comply with policy provisions because (a) the insurance company denied coverage and thus waived any requirement of compliance with conditions precedent; (b) American Empire had sufficient notice of Hathaway's suit against Whisnant; and (c) American Empire produced no evidence that its insured failed to cooperate or that it was prejudiced by any such failure.

(a) American Empire did not waive its right to require that its insured comply with the insurance contract's conditions precedent by denying claims made under the contract. "One who obtains a judgment against the insured and then seeks to enforce it against the insurer . . . derives his rights under the policy through the insured . . . , and he is entitled to recover under the policy only if it appears that all conditions precedent have been complied with." *Wolverine Ins. Co. v. Sorrough*, 122 Ga. App. 556, 557-558 (1) (b) (177 SE2d 819) (1970).

(b) American Empire had sufficient notice of both the claims made and of Hathaway's suit against Whisnant. The record establishes that American Empire had notice of each of the three claims within a month of their occurrence,[2] and almost immediately denied them on the ground that the contract was not in effect when the incidents occurred. Later, when Hathaway filed suit against Whisnant, Hathaway sent a copy of the complaint by certified mail to the person designated in the insurance policy to receive notices, general counsel for Great American Insurance Company. Along with a copy of the complaint, Hathaway included a letter stating that Whisnant's agent for service of process had died and the company had been evicted from its place of business and could not be served directly. The record includes a return of service showing that the general counsel received the complaint and letter, a copy of which was also sent to American Empire's lawyer. Hathaway perfected service on Whisnant by sending certified mail to the address listed with the Secretary of State for process of service, and notified American Empire's lawyer that the certified mail had been returned as undeliverable, in time for the company to file a timely answer on its insured's behalf. Neither Whisnant nor American Empire on Whis-

---

[2] These initial claims were made by Hathaway under its now-abandoned claim as an additional insured.

nant's behalf responded to Hathaway's complaint. Hathaway obtained a judgment for $187,696 and sent a copy to American Empire's counsel.

American Empire argues that it never received notice of the claim or the suit directly from Whisnant, its insured, and therefore is not liable under the policy for the default judgment against Whisnant. Its initial notice of the claim from Hathaway was not notice from Whisnant, it contends, because the initial notice was from Hathaway as an additional insured. The insurer further asserts that Hathaway's certified letter to the person named in the contract to receive notice is insufficient because it did not come from Whisnant and because Hathaway stated it sent the notice under OCGA § 33-7-15, which involves motor vehicle policies. Clearly OCGA § 33-7-15 does not apply here, because this policy is not a motor vehicle liability policy; equally clearly, the reference to the statute is irrelevant as to whether the notice was sufficient or not.

"The purpose of notice is to enable the insurer to inform itself promptly concerning the accident, so that it may investigate the circumstances, prepare for a defense, if necessary, or be advised whether it is prudent to settle any claim arising therefrom." (Citations and punctuation omitted.) *Southeastern Express Systems v. Southern Guaranty Ins. Co. of Ga.*, 224 Ga. App. 697, 701 (482 SE2d 433) (1997). Here, American Empire received initial notice of the claims within a month after the incidents occurred, and received notice of the lawsuit and of statutory service on its insured before the case went into default. "[I]t makes no difference who gives the notice, so long as a reasonable and timely notice is given the company and it has actual knowledge of the pendency of a claim or suit." *Stonewall Ins. Co. v. Farone*, 129 Ga. App. 471, 474 (199 SE2d 852) (1973) (timely forwarding of suit by injured plaintiff to tortfeasor's insurer sufficient to invoke coverage under policy); *Rowe v. Ga. Cas. &c. Co.*, 158 Ga. App. 159, 165 (3) (279 SE2d 318) (1981). American Empire has known about these claims all along, and had adequate notice of both the claims and the lawsuit against its insured Whisnant. Notice from Hathaway was sufficient under Whisnant's CGL policy to fulfill the contractual condition of notice.

(c) American Empire did not argue in its motion for summary judgment that Whisnant failed to cooperate in investigating this claim, but only argued generally that Whisnant did not provide any information or take any other actions that were "prerequisites to Hathaway's right to bring a direct action against [American Empire] to recover its judgment against Whisnant." Therefore, considering the record in the light most favorable to respondent Hathaway, the trial court's conclusion that Whisnant "ignored" the requirement that it cooperate with American Empire in investigating this claim is

not supported by the record.

2. Hathaway argues that the trial court erred in concluding that the property damage in question was not caused by an "occurrence," defined under the contract as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." American Empire responds that "five judges" have previously concluded that Hathaway's losses did not arise from an "occurrence" because the plumbing work Whisnant performed was intended, not accidental. Of those five judges, however, four of them are federal judges who examined this clause in a different context, which was Hathaway's claim made as an insured under its own CGL policy, and whose holdings in any case are not binding on this court. The fifth judge, the trial judge here, relied at least in part on the federal courts' analyses, in an order drafted by American Empire. The trial court held that, in Hathaway's suit against its primary insurance carrier, the district and federal appellate courts properly held that "an abundance of Georgia case law holds that general liability policies simply do not cover the costs of fixing the faulty workmanship of a contractor or subcontractor because poor workmanship does not constitute an accident."

To the contrary, while construction defects constituting a breach of contract are not covered by CGL policies, *Gary L. Shaw Builders v. State Auto. Mut. Ins. Co.*, 182 Ga. App. 220 (355 SE2d 130) (1987), negligently performed faulty workmanship that damages other property may constitute an "occurrence" under a CGL policy. *SawHorse, Inc. v. Southern Guaranty Ins. Co. of Ga.*, 269 Ga. App. 493, 498 (2) (604 SE2d 541) (2004). "An accident is an unexpected happening rather than one occurring through intention or design. [Cit.]" (Punctuation omitted.) *Custom Planning & Dev. v. American Nat. Fire Ins. Co.*, 270 Ga. App. 8, 10 (606 SE2d 39) (2004). In this case, Hathaway's default judgment was based on its claim of negligence against Whisnant, and American Empire cannot now argue that Hathaway's claim was actually for breach of contract. Cf. id. (arbitrator's award based on breach of contract; thus negligence was excluded as basis for liability); *McDonald Constr. Co. v. Bituminous Cas. Corp.*, 279 Ga. App. 757, 762 (632 SE2d 420) (2006) (case involved only contract claims, not negligence claims). The factual issue of whether Whisnant's negligence caused these damages has thus been decided as a matter of law; accordingly, the trial court erred in concluding that these incidents were not "occurrences" as provided by the policy.

The opinion in *Owners Ins. Co. v. James*, 295 FSupp.2d 1354, 1364 (N.D. Ga. 2003) does not require a different result. While the district court in that case held that insurance policies with similar language "cover only injury *resulting from accidental acts* and not

injury *accidentally caused by intentional acts*," the case predates *SawHorse*, which is a Georgia case and thus binding precedent.

3. Hathaway argues that the trial court erred in determining its claims were defeated by certain contract exclusions. The insurance contract provides broad coverage, and "[e]xceptions and exclusions to coverage must be construed strictly in favor of the insured and against the insurer. [Cit.]" *Furgerson v. Cambridge Mut. Fire Ins. Co.*, 237 Ga. App. 637, 639 (516 SE2d 350) (1999). An insurer seeking to defeat a claim based on a policy exclusion has the burden of proving that the exclusion is applicable, and the absence of evidence does not prove the exclusion applies. Id. at 638. Thus, to prevail American Empire must establish without dispute that Hathaway's claims against Whisnant are excluded. The claims involve three separate job sites, and American Empire contends that three different exclusions apply.

(a) Exclusion (n) provides that coverage does not apply to damages incurred for the loss of use, repair, or replacement of "your work" if "such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it." This provision

> is known as the "sistership" exclusion, a term derived from an occurrence in the aircraft industry in which one plane crashed and its "sisterships" were thereafter grounded and recalled by the manufacturer in order to correct the common defect that had caused the crash. [Cits.] The provision is intended to exclude from coverage the cost of preventative or curative action by withdrawal of a product in situations in which a danger is to be apprehended. [Cits.]

*Todd Shipyards Corp. v. Turbine Service*, 674 F2d 401, 419 (5th Cir. 1982), disapproved on other grounds, *Fogleman v. ARAMCO*, 920 F2d 278 (5th Cir. 1991). This court has noted that buildings "are not 'products' and thus are not excluded from coverage by Exclusion (n) of the standard form comprehensive general liability policy." *Stratton & Co. v. Argonaut Ins. Co.*, 220 Ga. App. 654, 656 (1) (469 SE2d 545) (1996) (physical precedent only). Accordingly, exclusion (n) does not defeat any of Hathaway's claims.

(b) Exclusions (j) (5) and (j) (6) provide:

> This insurance does not apply to . . .
> (j) "Property damages" to . . .
> (5) That particular part of real property on which you
or any contractors or subcontractors working directly or

indirectly on your behalf are performing operations, if the "property damage" arises out of those operations or;

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

. . .

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

The policy defines "products-completed operations hazard" as property damage occurring away from property owned by the insured and arising out of "your work," except work that was not yet completed. "Your work" means work or operations performed by you and "materials, parts or equipment furnished in connection with such work or operations."

The trial court noted that the federal courts who ruled on identically-worded exclusions in Hathaway's CGL policy excluded Hathaway's claim for costs associated with repairing Whisnant's work. But Hathaway's claims made on its own behalf against its own insurer are not equivalent to its claims as a judgment creditor against its debtor's insurer. The scope of a general contractor's work is much greater than the scope of a subcontractor's work, and thus an exclusion barring damage to "your work" is much more comprehensive when applied to a general contractor.

One commentator noted:

The purpose of paragraph 5 [of Exclusion (j)] . . . is to exclude only "that particular part" of property on which work is being performed by or on behalf of the insured. For example, say that a subcontractor is erecting steel beams in a building. One of the beams falls, while being attached, and damages the work of the general contractor and other subcontractors. The general contractor, if held responsible for the loss, should be protected under its policy for damage caused by the beam, but coverage should not be expected for damage to the beam that fell. If considered real property, the beam is excluded as "that particular part of real property."

Donald S. Malecki and Arthur L. Flitner, Commercial General Liability: The Claims-Made and Occurrence Forms 33 (4th ed. 1992).

Georgia courts agree that an insurance policy exclusion against recovery for damages to "your work" does not apply to claims against a subcontractor for damage to property on which the

subcontractor did not work.

> In a comprehensive general liability policy, such exclusions from coverage for property damage are generally referred to as "business risk" exclusions, and are designed to exclude coverage for defective workmanship by the insured causing damage to the project itself. The risk that defective or faulty workmanship will damage other property is the type of risk for which comprehensive general liability coverage is contemplated.

(Citations and punctuation omitted.) *Canal Indem. Co. v. Blackshear Farmers Tobacco Warehouse*, 227 Ga. App. 637, 639 (5) (490 SE2d 129) (1997). In that case, a subcontractor whose partial roof repair failed was covered for damage to the rest of the roof and to stored tobacco damaged by the elements, but was not covered for damage to the part of the roof it repaired. In *SawHorse*, supra, 269 Ga. App. 493, the contractor failed to install support beams when adding a second story to a house, which allegedly damaged both the new addition and the existing structure of the original one-story house. We held that, while damage to the new addition would not be covered, damage to the existing structure would, and remanded for a factual determination of "whether — or to what extent — the allegedly defective workmanship caused damage to the construction project itself, a business risk borne by the contractor, or to other property, a risk covered by SawHorse's general commercial liability policy." Id. at 498.

American Empire argues that Georgia courts have held that (j) (5) and (6) are "business risk exclusions" which "unambiguously bar coverage for damage to an insured's work at the time that the insured or its subcontractors are performing the work, if the damage is caused by the faulty workmanship of the insured or its subcontractors," citing *Bituminous Cas. Corp. v. Northern Ins. Co. &c.*, 249 Ga. App. 532, 533-534 (548 SE2d 495) (2001), and *Sapp v. State Farm Fire &c. Co.*, 226 Ga. App. 200, 202-203 (486 SE2d 71) (1997). While an awareness of the business risk concept helps to understand some of the key provisions of the CGL policy, the scope of coverage is found in the four corners of the contract. G. H. Tinker, Comprehensive General Liability Insurance — Perspective and Overview, 25 Fed. Ins. Council Quarterly 217, 226 (1975).

In *Bituminous*, the general contractor was not covered because he was responsible for the entire construction project, and thus the definition of "your work" in the exclusions was much broader. Id. at 534. The court in *Sapp* did not analyze the exclusionary language, but simply concluded that the exclusions unambiguously "exclude

coverage for defective workmanship by the insured ... causing damage to the construction project itself." Id. at 203. Factually, the insured in *Sapp* improperly installed hardwood flooring and was not covered for any damages directly related to replacing the flooring. This holding comports with the analysis in *Canal Indem.* and *SawHorse*, and applies in this case: the CGL policy does not cover the costs to replace the defective workmanship — here, the defective plumbing — but does cover the costs to repair damage to other property caused by the defective workmanship.

With these concepts in mind, we consider Hathaway's damage claims at the three locations. At Bartram Springs and Village Highlands the damages occurred while Whisnant was still on the job, and because these claims did not involve completed operations Exclusion (j) (6) does not apply. Exclusion (j) (5) excludes from coverage damage to "that particular part of real property" on which the subcontractor was working. In Village Highlands, Whisnant had completed work in the apartment building where a pipe began leaking and was working in another building. At Bartram Springs, storms caused flooding due to Whisnant's installation of undersized pipes, and the flood waters ruined all of the site preparation work to date, which had to be redone. In both cases, the damage claimed was not to "that particular part of real property" where the subcontractor was working, i.e., the plumbing, but to the other property damaged by the faulty plumbing.

At Walden Legacy apartments, the damages occurred after Whisnant had completed its work and left the job site, and thus (j) (5), excluding coverage for property damage to property on which the insured is "performing operations," does not apply. Hathaway's claims against Whisnant arose after faulty dishwasher plumbing allowed a pressurized hose to break loose and spew water into an apartment for an extended length of time, damaging that unit and others nearby. Exclusion (j) (6), which excludes payment for property that must be repaired "because your work was incorrectly performed on it," does not exclude this claim from coverage because again Hathaway did not seek payment for repairing the plumbing. It sought repayment for the costs incurred in repairing the water damage to cabinets, drywall, carpets, and other property belonging to the apartment owner or the tenants who had moved into the completed units.

For these reasons, the trial court erred in granting summary judgment to American Empire on Hathaway's claim under Whisnant's CGL policy as a judgment creditor.

*Judgment reversed. Miller, C. J., and Andrews, P. J., concur.*

DECIDED NOVEMBER 16, 2009 —

*Miller, Cowart & Howe, Craig N. Cowart*, for appellant.
*Locke, Lord, Bissell & Liddell, John F. Kane, J. David Hopkins III, Garrett L. Pendleton*, for appellee.