**FIRST COAST ENERGY, LLP,**
**a Colorado limited liability**
**partnership, Plaintiff,**

v.

**CINCINNATI INSURANCE COMPANY,**
**an Ohio corporation, and Central Mutual Insurance Company, an Ohio corporation, Defendants.**

**Case No. 3:15–cv–1256–HES–JRK**

United States District Court,
M.D. Florida,
**Jacksonville Division.**

Signed 01/04/2017
Filed 01/05/2017

James Arthur Bolling, Stephen D. Busey, Smith, Hulsey & Busey, Jacksonville, FL, for Plaintiff.

R. Daniel Noey, Wesley David Fina, Schutt, Schmidt & Noey, Jacksonville, FL, Stephen J. Rapp, Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC, Atlanta, GA, for Defendants.

## ORDER

HARVEY E. SCHLESINGER,
UNITED STATES DISTRICT JUDGE

**THIS CAUSE** is before the Court on Defendant Central Mutual Insurance Company's ("Central") "Motion for Judgment on the Pleadings" (Dkt. 11), and Plaintiff First Coast Energy, LLP's ("First Coast") Response in opposition thereto (Dkt. 17). Upon review of the parties' filings and the relevant case law, the Court determines the following.

## I. BACKROUND

This case is an action to recover under a *Coblentz* agreement entered into by First Coast and Central's insured, Georgia Tank Co., Inc. d/b/a/ Metal Products Company ("Metal Products"). The material facts are undisputed.[1] In 2009 and 2010, First Coast purchased and installed 115 underground gas tanks from Metal Products to store fuel at First Coast's convenience stores. (Compl. ¶¶ 9–12). Metal Products' negligent manufacture of the tanks resulted in 13 of the purchased tanks to fail or deteriorate, which caused damage to First Coast's property. (*Id.* ¶¶ 13–14).

Subsequently, First Coast filed suit against Metal Products to recover damages arising from the defective tanks. (*Id.* ¶ 15). Metal Products requested that its insurers, Central and Cincinnati Insurance Company ("Cincinnati"), defend and indemnify Metal Products under the commercial general liability ("CGL") policies each had issued to Metal Products. (*Id.* ¶ 16). Both insurers refused to do so, advancing numerous bases for the denial of coverage. (*Id.* ¶ 19). First Coast and Metal

---

1. In a previous Order, this Court granted Defendant Cincinnati Insurance Company's unopposed motion to take judicial notice of the Complaint in this action, as well as Exhibit B to the Complaint in the action underlying this case, Case No. 3:15–C–0080–MMH–PPB.

(*See* Dkt. 28). Exhibit B in the underlying action is a series of express warranties extended to First Coast for their purchase of underground fuel storage tanks from Metal Products. (*See* Case No. 3:15–C–0080–MMH–PPB, Dkt. 2–2)

Products ultimately settled the case, and agreed to a consent judgment finding Metal Products liable to First Coast for breaches of the express and implied warranties alleged in the Complaint, as well as for related and consequential property damages. (*Id.* pp. 20–23). Metal Products also assigned its rights and potential causes of action under the CGL policies to First Coast. (*Id.* ¶ 21).

First Coast filed the present declaratory judgment action against Central and Cincinnati, and asserts that both insurers had an obligation to defend and indemnify Metal Products for the damages First Coast suffered from the defective tanks. (*Id.* ¶ 22). In response, Central filed the present motion which requests judgment on the pleadings. (Dkt. 11). In its motion, Central insists that the policies do not provide coverage for the claims at issue and thus, it had no duty to defend or indemnify Metal Products in the underlying action. (*See id.* pp. 6–16).

## II. STANDARDS OF REVIEW

Motions for judgment on the pleadings are governed by Rule 12(c) of the Federal Rules of Civil Procedure, which provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (quoting *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001)). Put differently, judgment on the pleadings will be granted "only when the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Horsley*

*v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002) (quoting *Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1213 (11th Cir. 2001)). "In determining whether a party is entitled to judgment on the pleadings, we accept as true all material facts alleged in the non-moving party's pleading, and we view those fact in the light most favorable to the non-moving party." *Perez*, 774 F.3d at 1335 (citing *Hawthorne v. Mac Adjustment Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)).

■■■ Under Georgia law,[2] "Insurance is a matter of contract and the parties to the contract of insurance are bound by its plain and unambiguous terms." *Hurst v. Grange Mut. Cas. Co.*, 266 Ga. 712, 470 S.E.2d 659, 663 (1996). An insurer may set the terms of its own policies, "insuring against certain risks and excluding others, provided the terms are not contrary to law." *Id.* (citing *Hulstzman v. State Farm Fire & Cas. Co.*, 188 Ga.App. 12, 372 S.E.2d 9 (1988)). However "any exclusions from … coverage must be defined clearly and distinctly." *State Farm Fire & Cas. Co. v. Walnut Ave. Partners, LLC*, 296 Ga.App. 648, 675 S.E.2d 534, 537 (2009). And any ambiguities in the policy language will be strongly construed against the insurer. O.C.G.A. § 13-2-2(5).

■■■ Nevertheless, Georgia's rules of construction also require that the policy be "construed where possible to uphold the contract in whole and in every part, avoiding interpretations that render portions of the contract language meaningless." *Walnut Ave.*, 675 S.E.2d at 537 (citing O.C.G.A. § 13-2-2(4)). Thus, an unambiguous exclusion "binds the parties to its terms and must be given effect, even if beneficial to the insurer and detrimental to

---

**2.** For purposes of deciding the present motion, the parties concede that Georgia law applies.

the insured." *Fidelity Nat. Title Ins. Co. of New York v. OHIC Ins. Co.*, 275 Ga.App. 55, 619 S.E.2d 704, 706 (2005) (internal quotation marks and citations omitted); *see also Reed v. Auto–Owners Ins. Co.*, 284 Ga. 286, 667 S.E.2d 90, 92 (2008) ("Where the contractual language unambiguously governs the factual scenario before the court, the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured.").

"[W]hether an insurer has a duty to defend depends on the language of the policy as compared with the allegations of the complaint." *Hoover v. Maxum Indem. Co.*, 291 Ga. 402, 730 S.E.2d 413, 418 (2012). "If the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." *Id.* (quoting *BBL–McCarthy, LLC v. Baldwin Paving Co.*, 285 Ga.App. 494, 646 S.E.2d 682 (2007)). However, "the insurer is justified in refusing to defend the insured's lawsuit" if the facts alleged do not state a claim for which there would be coverage. *City of Atlanta v. St. Paul Fire & Marine Ins. Co.*, 231 Ga.App. 206, 498 S.E.2d 782, 784 (1998).

The duty to defend is "separate and independent" from the insurer's duty to indemnify. *Shafe v. Am. States Ins. Co.*, 288 Ga.App. 315, 653 S.E.2d 870, 873 (2007); *see also Penn–America Ins. Co. v. Disabled Am. Veterans, Inc.*, 224 Ga.App. 557, 481 S.E.2d 850, 852 (1997) ("[A]n insurer's duty to pay and its duty to defend are separate and independent obligations."). Nevertheless, "an insurer's duty to defend is broader than its duty to indemnify." *Shafe*, 653 S.E.2d at 873. Hence, no duty to indemnify can arise where there

exists no duty to defend. *See Nat'l Cas. Co. v. Pickens*, 582 Fed.Appx. 839, 841 (11th Cir. 2014) (stating, "If there is no duty to defend, then there is no duty to indemnify.") (applying Georgia law); *see also Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 225 (3d Cir. 2005) ("Because the duty to defend is broader than the duty to indemnify, there is no duty to indemnify if there is no duty to defend.").

## III. ANALYSIS

Central argues that the general policy[3] issued to Metal Products does not cover the property damages alleged in First Coast's Complaint. (Dkt. 11 pp. 8–10). Alternatively, Central argues, even if the Complaint is found to allege damages sufficient to state a claim under the general policy, the policy's various exclusions operate to preclude coverage. Thus, Central avers, it had no duty to defend or indemnify Metal Products in the underlying action. (*Id.* pp. 8–16). First Coast's response is that the damages alleged are covered by the plain language of the policy, and that the policy's exclusions are inapplicable as the tanks constitute real property. (*See generally* Dkt. 17). Moreover, First Coast insists, Central waived certain of these defenses and exclusions because Central did not include them in its letter denying coverage. (*Id.* ¶¶ 15, 17, 28).

Addressing only the issues necessary to resolve the matter, the Court concludes that the policy provides no coverage to the extent First Coast seeks recovery for the loss of use of the defective tanks, or for their repair and replacement. Further, the Court finds that the remainder of the damages are excluded by the policy's "Exclu-

---

**3.** Central actually issued two general liability policies to Metal Products covering the same time period. (Dkt. 11 p. 2). Since the applicable terms of both insurance policies are iden-

tical, the Court will refer and cite to the "policy" in the singular throughout this order.

sion—Products–Completed Operations Hazard" endorsement.

## A. "Property Damage"

■ Metal Products' policy provides that Central "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Dkt. 9–3 p. 31). "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use to that property" or "loss of use of tangible property that is not physically injured." (*Id.* p. 45).

First Coast seeks recovery for the following damages: (1) increased maintenance costs, (2) costs of partial and temporary repair of thirteen tanks, (3) decreased value of the gas stations because of the defective tanks, (4) loss of use of the tanks, (5) fouled fuel, (6) costs of professionals to diagnose problems with the tanks, and (7) costs. (Dkt. 1 pp. 15–16). Central argues that to the extent the Complaint seeks recovery for the repair and replacement of the defective tanks, the Complaint does not allege "property damage" as defined by the policy. (Dkt. 11 p. 9). First Coast's response is that Metal Products' negligence caused resulted in, among other things, the fouling of fuel stored in the defective tanks and increased maintenance costs, all of which constitute "physical injury to [First Coast's] tangible property." (Dkt. 17 ¶¶ 20–22). Thus, First Coast argues, because all the damages alleged in its Complaint are the result of Metal Products' negligence, the entirety of the alleged damages constitute "property damage" within the scope of the general insurance policy. (*Id.* ¶ 25). First Coast is incorrect.

■ "[T]he purpose of ... comprehensive liability insurance coverage is to provide protection for personal injury or for property damage caused by the completed product, but not for the replacement and repair of that product." *Elrod's Custom Drapery Workshop v. Cincinnati Ins. Co.*, 187 Ga.App. 670, 371 S.E.2d 144, 145 (1988) (internal quotation marks and citations omitted). Thus, consistent with that purpose, damages that refer to defective work does not qualify as "property damage." *See Taylor Morrison Servs., Inc. v. HDI–Gerling Am. Ins. Co.*, 293 Ga. 456, 746 S.E.2d 587, 591 (2013) (" '[P]roperty damage,' as the term is used in the standard CGL policy, necessarily must refer to property that is nondefective, and to damage beyond mere faulty workmanship . . . ."). As the Georgia Supreme Court has explained:

> Recall that the standard CGL policy defines "property damage" as "[p]hysical injury to tangible property" or "[l]oss of use of tangible property that is not physically injured." Property or work that is inherently defective because it was produced by faulty workmanship cannot be said to have been "physically injured" by the very faulty workmanship that brought it into being in the first place. Likewise, property or work that is inherently defective cannot be said to have sustained a "[l]oss of use" to the extent that it was unusable at its creation, inasmuch as a "[l]oss of use" necessarily requires that the property or work once have been capable of being put to use. A number of courts adopting, as we do, the usual and common understanding of "accident" have nonetheless concluded that a claim for the repair or replacement of faulty workmanship is not covered by a standard CGL policy—not because there was no "occurrence"—but most typically because such a claim is not a claim for "property damage."

*Id.*, 746 S.E.2d at 592 n.10 (alterations in original).

The tanks, as delivered, were defective. (*See* Compl. ¶ 14) ("The failure and material deterioration of the tanks was the result of Metal Products' negligent *manufacture* of the tanks." (emphasis in original)). Under the *Taylor* court's reasoning, the inherently defective tanks "cannot be said to have been 'physically injured'" by defects which were present at delivery. *Taylor*, 746 S.E.2d at 592 n.10. Moreover, the defective tanks cannot have sustained a "loss of use" for the tanks' failure to properly store fuel, because the tanks were incapable of properly doing so in the first place. *See id.* Thus, to the extent First Coast's Complaint seeks to recover damages for the repair and replacement of the defective tanks, or for the loss of use of the defective tanks, the Complaint does not allege "property damage." And to the extent the Complaint fails to allege "property damage," it fails to allege damages covered by the policy.[4]

---

4. The result is consistent with the reasoning of other courts that have considered the issue. *See, e.g., Crossmann Cmtys. of N. Carolina, Inc. v. Harleysville Mut. Ins. Co.*, 395 S.C. 40, 717 S.E.2d 589, 593 (2011) ("We emphasize the difference between a claim for the costs of repairing or removing defective work, which is not a claim for 'property damage,' and a claim for the costs of repairing damage caused by the defective work, which is a claim for 'property damage.'" (internal quotation marks omitted)); *Auto-Owners Ins. Co. v. Pozzi Window Co.*, 984 So.2d 1241, 1248 (Fla. 2008) ("[T]he mere inclusion of a defective component, such as a defective window ... does not constitute property damage unless that defective component results in physical injury to some other tangible property.); *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 691–92 (7th Cir. 2008) ("The cost of repairing or replacing defective work is not property damage."); *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 677 (Tex. Ct. App.–Hous. [14 Dist.] 2006), *abrogated by Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118 (Tex. 2010) (holding that costs for the removal and replacement of defective stucco, including inspection and overhead

## B. The "Products–Completed Operations Hazard" Exclusion

To the extent First Coast's Complaint does allege damage to its non-defective property—for lost profits and fouled fuel, for instance—it states a claim for "property damage."[5] Nevertheless, the entirety of these damages are excluded by the policy's "Exclusion—Products–Completed Operations Hazard" endorsement.

Metal Products' policy contains an endorsement—titled, "Exclusion—Products–Completed Operations Hazard"—which reads, "This insurance does not apply to 'bodily injury' or 'property damage' included within the 'products-completed operations hazard.'" (Dkt. 9–3 p. 48). "Products-completed operations hazard" (hereinafter "PCOH") is defined in relevant part to:

a. Incude[ ] all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising

---

costs, did not constitute "damages because of ... property damage").

5. Central argues that although these remaining damages potentially qualify as "property damage," the damages did not occur until after the expiration of the policy period. (*See* Dkt. 11 p. 10). Resolution of the issue would turn on whether the Court were to adopt a "manifestation trigger" (coverage is triggered only when the damage occurs and is discovered within the policy period) or a "continuous trigger" (coverage is triggered from the moment of exposure to the defect, rather than the moment injury) as the appropriate coverage trigger. *See Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*, 136 F.Supp.2d 1340, 1345–46 (N.D. Ga. 2001). Although the holding in *Arrow Exterminators* suggests that a "continuous trigger" would be appropriate in this case, the Georgia Supreme Court has so far declined to rule on the issue. Because the damages alleged either do not qualify as "property damage" or are excluded under the policy's "Exclusion—Products–Completed Operations Hazard" endorsement, it is not necessary for the Court to address this argument.

out of 'your product' or 'your work' except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. [Provision continues with explanation about what circumstances constitute completion or abandonment].

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete will be treated as completed.

(*Id.* p. 44–45). The damages the Complaint properly alleges as "property damages" are precisely the species of damages PCOH provisions are intended to cover:

The risk covered by the CGL premises and operations coverage differs from the risk posed once an insured relinquishes its products to third parties or completes its work. This latter risk is insured, for an additional hefty premium, under the products-completed operations hazard coverage. **The purpose of the products-completed operations hazard coverage is to insure against the risk that the product or work, if defective, may cause bodily injury or damage to property of others after it leaves the insured's hands.**

*Goodwin v. Wright*, 100 Wash.App. 631, 6 P.3d 1, 4 (2000) (emphasis added); *see also SawHorse, Inc. v. S. Guar. Ins. Co. of Georgia*, 269 Ga.App. 493, 604 S.E.2d 541, 544 (2004) ("The risk intended to be insured is the possibility that the work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the completed work itself . . . .") (internal quotation marks and citations omitted). Metal Products opted not to pay for the coverage that a PCOH provision would have provided. *See, e.g., Supreme Servs. & Specialty Co., Inc. v. Sonny Greer, Inc.*, 958 So.2d 634, 644 (La. 2007) ("The insurer covering the products-

completed operations hazard would *cover all claims* except the contractor's responsibility to repair and replace the [defective product] . . . ." (emphasis added)). Hence, the plain and unambiguous language of the policy excludes coverage for any "property damage" sustained by First Coast arising from Metal Products' (completed and relinquished) defective tanks.

First Coast contends the PCOH exclusion does not apply because the tanks became a part of First Coast's real property once installed and, therefore, fall outside the definition of "your product." (*See* Dkt. 17 pp. 4–6). For the same reasons the Court expressed in its previous Order, the Court rejects First Coast's strained construction of the exclusion:

[S]ince the damages complained of arise out of a defect that was present at delivery—*when the tanks were in the form of "your product"*—it follows that the now-triggered PCOH exclusion would operate to exclude any damages arising thereafter from the defective tanks (but only to property other than the tanks). That the tanks were later installed underground would not change the result; even assuming the tanks became realty, any damages suffered would still be the result of a defect "arising out of your product."

(Dkt. 43 p. 7) (emphasis in original).

As a final argument, First Coast suggests that the PCOH exclusion is "ambiguous, vague, and imprecise." (Dkt. 17 ¶ 36). "Ambiguity in an insurance contract is duplicity, indistinctiveness, or uncertainty of meaning of expression." *N. Ga. Petroleum Co. v. Federated Mut. Ins. Co.*, 68 F.Supp.2d 1321, 1325 (N.D. Ga. 1999) (quoting *Home Ins. Co. v. Sunrise Carpet Indus., Inc.*, 229 Ga.App. 268, 493 S.E.2d 641 (1997)). "When a provision of a policy is susceptible to more than one meaning, even if each meaning is logical

and reasonable, that provision is ambiguous." *Canal Indem. Co. v. Blackshear Farmers Tobacco Warehouse, Inc.*, 227 Ga. App. 637, 490 S.E.2d 129, 131 (1997).

First Coast's points out that "Products–Completed Operation Hazard" is defined "some pages before" the location of the endorsement which refers to it. (Dkt. 17 ¶ 36). The Court is unable to discern how this gives rise to "duplicity" or "uncertainty" in the meaning of the provision's language—it is standard drafting practice to define terms in sections different from the provisions that refer to them. First Coast also directs the Court's attention to the policy's "Advisory Notice to Policyholders," and that it includes the term "Products/Completed Operations Liability Coverage," which is contained under the heading "Supplementary Payments Section." (*Id.*). Again, the Court fails to grasp how this gives rise to an ambiguity in the meaning of the endorsement, or in the definition of "Products–Completed Operation Hazard" itself. More importantly, First Coast has not demonstrated, or even argued, that the provision "is susceptible to more than one meaning." *Canal Indem.*, 490 S.E.2d at 131.

In any case, numerous courts have held the PCOH provision's which contain the same language to be unambiguous. *See, e.g., Wilson Indus. Elec. Inc. v. Cincinnati Ins. Co.*, 246 Ga.App. 90, 539 S.E.2d 612, 614 (2000) (holding that an insurance policy's "products-completed operations hazard" exclusion is "unambiguous" and "requires no construction"); *see also Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So.2d 528, 539 (Fla. 2005) ("products-completed operations hazard" is unambiguous); *Atlantic Cas. Ins. Co. v. LTA Distributor, LLC*, No. 14–22788–cv, 2015 WL 3466256, at *3 (S.D. Fla. June 1, 2015) ("Florida courts have held that similar language in products-completed operations hazard exclusions is not ambiguous and is

enforceable." (citing cases)). Thus, the Court concludes that to the extent First Coast's Complaint states a claim for "property damage," the damages are excluded under the plain and unambiguous language of the policy's "Exclusion—Products–Completed Operations Hazard" endorsement.

## C. Waiver

 Finally, First Coast argues that Central waived certain of its defenses, "including the defense that [First Coast's] damages are not the type of property damages covered by Central's policies," because Central's coverage denial letter allegedly only mentions the PCOH exclusion. (Dkt. 17 ¶ 17). Central replies that it would be improper for the Court to consider the coverage denial letter on a motion for judgment on the pleadings as the letter was not mentioned in the Complaint, or included as an exhibit. (Dkt. 25 p. 2). Even if the Court chooses to consider the letter, Central contends, it did not waive any claims on non-coverage. (*Id.*).

As First Coast does not argue that Central waived the PCOH exclusion, the only question for the Court to consider is whether Central waived its argument that certain damages alleged in the Complaint do not constitute "property damage." This is a question the Court can answer without converting the present motion into one for summary judgment. *See Ramey v. Interstate Fire & Cas. Co.*, 32 F.Supp.3d 1199, 1203 (S.D. Fla. 2013) ("Generally, a court must convert a motion for judgment on the pleadings into a motion for summary judgment if it considers materials outside the pleadings."). Indeed, the Court has already answered the question.

Earlier in these proceedings, First Coast requested leave to amend its Complaint to include Central's coverage denial letter. (Dkt. 32 ¶ 10). The Court denied

First Coast's request as futile, and explained:

> "Under Georgia law, defenses to an insurer's obligation to pay a claim fall into two categories: 'policy defenses' and 'coverage defenses.'" *SavaSeniorCare, L.L.C. v. Beazley Ins. Co.*, 309 F.R.D. 692, 698 (N.D. Ga. 2015). A policy defense permits "an insurer [to] den[y] coverage based on the insured's failure to fulfill a procedural condition of the insurance policy." *Id.* (citation and internal quotation marks omitted). "Policy defenses may be waived because they exist purely for the benefit of the insurer." *Id.* On the other hand, a coverage defense permits an insurer to dispute whether the insurance policy covers the specific injury. *Id.* Although policy defenses may be waived, coverage defenses generally cannot be; to allow waiver or estoppel to prevent an insurer from raising coverage defenses would expand the available coverage beyond what was contracted for by the parties. *Id.* It is well settled that, "neither waiver nor estoppel can be used to create liability not created by an insurance contract and not assumed by the insurer under the terms of the policy." *Andrews v. Ga. Farm Bureau Mut. Ins. Co.*, [226 Ga. App. 316] 487 S.E.2d 3, 4 (Ga. App. 1997) (citing *Washington v. Hartford Accident & Co.*, [161 Ga.App. 431] 288 S.E.2d 343 (Ga. App. 1982)).

> . . . .

> Plaintiff asserts that Defendants waived any defense not raised in the coverage denial letters and are therefore estopped from raising them now. . . . [C]overage defenses generally cannot be waived even if they are not asserted in the coverage denial letters. Furthermore, Defendants in the instant case did not assume the defense of its insured, Metal Products, in the underlying action. As a result, any coverage defenses not originally raised by Defendants do not fall within the narrow exception to the general rule that coverage defenses cannot be waived. Thus. Defendants may raise any coverage defense regardless of what defenses were stated in the coverage denial letters.

(Dkt. 35 pp. 4. 6).

Central's argument that the Complaint does not allege "property damage" as to certain classes of damages is a coverage defense. Thus, whatever the contents of the coverage denial letter, this argument for non-coverage is not of the type that can be waived.

## IV. CONCLUSION

The entirety of the damages First Coast seeks to recover are either not covered as "property damage" or are excluded under the "Exclusion—Products–Completed Operations Hazard." As such, the Court concludes that Central had no duty to defend or indemnify Metal Products in the underlying action.

Accordingly, it is **ORDERED**:

1. Defendant Central Mutual Insurance Company's ("Central") "Motion for Judgment on the Pleadings" (Dkt. 11). is **GRANTED**;

2. The Clerk is directed to enter judgment in favor of Defendant Central Mutual Insurance Company that it does not owe a duly to **defend** or **indemnify** for the underlying action.

**DONE AND ORDERED** at Jacksonville. Florida, this 4th day of January. 2017.