**HOUSING ENTERPRISE INSURANCE COMPANY, INC., Plaintiff,**

v.

**AMTRUST INSURANCE COMPANY OF KANSAS, INC., Defendant.**

**CIVIL ACTION NO. 1:15–CV–01298–LMM**

United States District Court, N.D. Georgia, Atlanta Division.

Signed March 29, 2016

Alan R. Lyons, Herrick Feinstein, LLP, New York, NY, Richard Ward Brown, Thomas Eugene Brennan, Fain, Major & Brennan, P.C., Atlanta, GA, for Plaintiff.

Kenton Jones Coppage, J. Robert Persons, Smith, Moore, Leatherwood, LLP, Atlanta, GA, for Defendant.

## ORDER

LEIGH MARTIN MAY, UNITED STATES DISTRICT JUDGE

This diversity matter concerns a dispute over the allocation of settlement and defense costs between two insurance companies that provided coverage to common insureds named as defendants in an underlying wrongful death lawsuit. The action for declaratory judgment and equitable contribution is before the Court on Defendant's Motion to Dismiss for Failure to State a Claim and for Lack of Standing [6] and Plaintiff's Cross–Motion for Judgment on the Pleadings [11]. After a review of the record and due consideration, the Court enters the following Order:

## I. PROCEDURAL BACKGROUND

■ Plaintiff Housing Enterprise Insurance Company, Inc. ("HEIC") filed its Complaint on April 22, 2015, seeking declaratory relief and equitable contribution against Defendant AmTrust Insurance Company of Kansas, Inc. ("AmTrust"). Complaint, Dkt. No. [1]. HEIC is an insurance company incorporated under the laws of the State of Vermont, with its principal place of business in the State of Connecticut. Id. ¶ 2. AmTrust is an insurance company incorporated under the laws of the State of Kansas, with its principal place of business in the State of Texas. Id. ¶ 3. AmTrust issued an insurance policy that is the subject of this lawsuit to an insured

located within the Northern District of Georgia, rendering venue appropriate.[1] Id. ¶ 8.

AmTrust was served with a summons and copy of HEIC's Complaint on May 1, 2015. Dkt. No. [5]. AmTrust filed its motion to dismiss on May 22, 2015. Dkt. No. [6]. HEIC responded to the motion and filed its cross-motion for judgment on the pleadings[2] on June 19, 2015. Dkt. Nos. [10], [11]. AmTrust submitted a unified memorandum replying to HEIC's response and opposing HEIC's cross-motion. Dkt. No. [14]. HEIC then submitted a reply in support of its cross-motion. Dkt. No. [17]. Both motions are fully briefed and ripe for review.

## II. HEIC'S CROSS–MOTION FOR JUDGMENT ON THE PLEADINGS

■ AmTrust contends that HEIC's cross-motion should be dismissed under the plain text of Federal Rule of Civil Procedure 12(c) and under Eleventh Circuit law because it is premature. Dkt. No. [14] at 1–2.

■ "Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998) (citing FED. R.

---

1. Under Georgia law, "contracts are to be governed as to their nature, validity and interpretation by the law of the place where they are made." Travelers Prop. Cas. Co. of Am. v. Moore, 763 F.3d 1265, 1270 (11th Cir. 2014) (internal quotation marks and citation omitted). For purposes of applying this *lex loci contractus* rule, "an insurance contract is 'made' where it is delivered." Id. at 1271 (citation omitted). Neither party contests that Georgia law applies to HEIC's causes of action and cite to Georgia law throughout their

briefs. Accordingly, the Court applies Georgia law in this Order.

2. HEIC's response to AmTrust's motion [Dkt. No. 10] and HEIC's brief in support of its cross-motion [Dkt. No. 11–1] are identical. Because the response brief includes relevant exhibits, whereas the cross-motion does not, and because the Court resolves the cross-motion for present purposes without reference to its substantive argument, see Section II infra, the Court will cite to HEIC's response brief in this Order.

CIV. P. 12(c)). "In determining whether a party is entitled to judgment on the pleadings, we accept as true *all material facts alleged in the non-moving party's pleading*, and we view those facts in the light most favorable to the non-moving party." Perez v. Wells Fargo N.A., 774 F.3d 1329, 1335 (11th Cir. 2014) (emphasis added) (citing Hawthorne, 140 F.3d at 1370). It follows that the Court cannot properly evaluate a motion for judgment on the pleadings where there are no "material facts alleged in the non-moving party's pleading" to accept as true.

The Perez court examined the text and rationale behind Rule 12(c) and the decisions of other federal courts in concluding that "judgment on the pleadings is inappropriate when only a single pleading related to a claim (whether alleged in a complaint or counterclaim) has been filed." Perez, 774 F.3d at 1336. This is so because Rule 12(c)

> provides "a means of disposing of cases when ... a judgment on the merits can be achieved by focusing on the content of the *competing* pleadings...." 5C Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1367 (3d ed. 2004) (emphasis added). When only a single pleading has been filed, "competing pleadings" do not exist, so a motion for judgment on the pleadings is not appropriate. Cf. id. at 211 n. 10 (compiling case law demonstrating that judgment on the pleadings is proper after the defendant has answered). Rule 12(c) incorporates this principle by permitting motions for judgment on the pleadings only after the pleadings have "closed": "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).

Perez, 774 F.3d at 1336. Accordingly, as in Perez, the Court "must determine whether the pleadings were closed at the time" a party "sought judgment on the pleadings," or whether some exception applies. Id.

HEIC urges the Court to consider its cross-motion and AmTrust's motion simultaneously, as the motions consider "precisely the same legal and factual issues" and "the parties have fully advised the court of their intentions and a formal answer would not add anything." Dkt. No. [17] at 1–2. The Court is not persuaded by HEIC's reasoning, as whether AmTrust's answer would "add anything" is a matter best left to AmTrust, should its motion to dismiss HEIC's Complaint be denied. HEIC's Cross–Motion is **DENIED** without prejudice, and HEIC may renew its Rule 12(c) motion once the pleadings have closed or file a motion for summary judgment under Rule 56, as appropriate.

## III. AMTRUST'S MOTION TO DISMISS

### A. Legal Standard

The Court may dismiss a pleading for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. 5C Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1216 (3d ed. 2015); see also Ashcroft v. Iqbal, 556 U.S. 662, 677–78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. See Duke v. Cleland, 5 F.3d 1399, 1402 (11th Cir. 1993).

To state a claim under Rule 12(b)(6), "detailed factual allegations" are not required, but "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555,

127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to ';state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955). A complaint is plausible on its face when it provides the factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

## B. Allegations of the Complaint

### 1. The Underlying Action

The current case involves insurance policies governing a separately filed wrongful death case. That case concerned a shooting death at Sunset Village Apartments. Sunset Investments, LLC owned Sunset Village Apartments (the "Apartments"), a residential property in Cleveland, Mississippi. Dkt. No. [1] ¶ 12. Sunset Investments contracted with Carroll Management Group, LLC ("Carroll") to serve as the property manager of the Apartments. Id. ¶ 14; Dkt. No. [1–3], Property Management Agreement, Ex. C. to Complaint.[3] At all times relevant to this lawsuit, Sunset Investments owned and Carroll managed the Apartments. Dkt. No. [1] ¶ 12. Carroll employed Arlecia Bush as the on-site manager at the Apartments. Id.

On November 4, 2013, a lawsuit was commenced in the Circuit Court of Bolivar County, Mississippi against Sunset Investments, "Carroll Organization, LLC," and "Angela Bush." Dkt. No. [1–1], Sanders v. Sunset Investments, LLC, et al., Civ. A.

No. 2013–13 (Cir. Ct. Miss. Nov. 4, 2013), Complaint With Discovery Attached, Ex. A to Complaint (the "Underlying Action"). According to the complaint filed in the Underlying Action, a minor was shot and killed at the Apartments due to negligence in failing to keep the Apartments safe and secure and in failing to take reasonable measures to protect invitees from foreseeable harm. Dkt. No. [1] ¶¶ 11, 13. The complaint sought damages for the minor's wrongful death. Id. ¶ 13.

On November 4, 2014, the parties to the underlying action agreed to correct the name of the Carroll entity from "Carroll Organization, LLC" to its actual corporate name, Carroll Management Group, LLC. Id. ¶ 10; Dkt. No. [1–2], Agreed Order, Ex. B to Complaint. Until the agreed order was filed, Carroll had not been named as a defendant in the Underlying Action.

HEIC acknowledged a duty to defend Sunset Investments, Carroll, and Bush and provided for their legal defense in the Underlying Action. Dkt. No. [1] ¶¶ 19–21. On October 8, 2014, HEIC requested that AmTrust acknowledge a duty to defend Carroll and Bush and agree to contribute to HEIC's costs of defense on an equal basis. Id. ¶ 22; Dkt. No. [6–1], Letter of October 8, 2014, Ex. 1 to Motion to Dismiss. HEIC renewed its request on November 11, 2014. Dkt. No. [1] ¶ 23. AmTrust did not respond.

The parties to the Underlying Action settled for $500,000 in January 2015. Id. ¶ 24. After settlement was reached, but

---

3. As a general rule, when considering a Rule 12(b)(6) motion to dismiss the Court does not consider anything beyond "the face of the complaint and documents attached thereto." Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1368 (11th Cir. 1997). The Court may—but is not required to—consider a document attached to a motion to dismiss "in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, [and] its contents are not in dispute." Fin. Sec. Assurance, Inc. v. Stephens, 500 F.3d 1276, 1284 (11th Cir. 2007). The Court has considered the documents attached as exhibits to HEIC's Complaint as well as to AmTrust's motion to dismiss because each of them is central to HEIC's claims and the parties have not challenged the authenticity of any of these exhibits.

before it was paid, HEIC again contacted AmTrust on January 15, 2015, informing it of the settlement and demanding that it pay half of the settlement amount and reimburse HEIC for half of its litigation fees and costs. Id. ¶ 25. HEIC incurred at least $118,000 in legal fees and costs in defending the Underlying Action. Id. ¶ 27. On January 26, 2015, HEIC paid the settlement proceeds on behalf of Sunset Investments, Carroll, and Bush. Id. ¶ 26.

AmTrust sent a letter dated January 30, 2015, declining to reimburse HEIC for any portion of its settlement and litigation expenses, citing AmTrust's "Other Insurance" clauses for its position that coverage under the AmTrust Policy was excess over the HEIC Policy coverage, not primary. Id. ¶¶ 28–29.[4]

### 2. The Insurance Policies

Sunset Investments purchased a commercial general liability insurance policy from HEIC (the "HEIC Policy") that provided coverage at the time the Underlying Action was filed. Dkt. No. [1] ¶ 15. The HEIC Policy contains an Each Occurrence Limit of $1 million and a General Aggregate Limit of $2 million. Id.; Dkt. No. [1–4], HEIC Policy, Ex. D to Complaint, at 4. Though Sunset Investments is the named insured, the HEIC Policy also defines "Insured" to include "any person or organization, except your employees, while acting as your real estate manager." Dkt. No. [1] ¶ 17; Dkt. No. [1–4] at 12. The HEIC Policy contains an "Other Insurance" provision, under which HEIC concedes the HEIC Policy provides primary coverage to Sunset Investments, Carroll, and Bush with respect to the Underlying Action. Id. ¶¶ 30–31.

The Property Management Agreement also requires Carroll to obtain liability insurance, at Sunset Investments' expense. Dkt. No. [1–3] at 10–11. Carroll obtained a commercial general liability insurance policy from AmTrust (the "AmTrust Policy") that provided coverage at the time the Underlying Action was filed. Dkt. No. [1] ¶ 16. Like the HEIC Policy, the AmTrust Policy contains an Each Occurrence Limit of $1 million and a General Aggregate Limit of $2 million. Id.; Dkt. Nos. [1–5], [1–6], [1–7], [1–8], [1–9], AmTrust Policy, Ex. E to Complaint, at 12.[5] The AmTrust Policy also contains an "Other Insurance" provision, which states in full:

H. Other Insurance

1. If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due

---

4. The parties have filed, as attachments to responsive briefs, several letters and emails between HEIC and AmTrust in which their respective employees discuss HEIC's request for contribution and the timeliness of its notification to AmTrust. Although the Court could consider these documents on a Rule 12(b)(6) motion to dismiss because their respective authenticity is not challenged by either party and because they are central to the plaintiff's claims, see footnote 3 supra, the Court declines to do so at this time. For the reasons discussed infra, these documents address questions of fact best determined on a fully developed factual record. See Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP, 609 Fed.Appx. 972, 976 (11th Cir. 2015) (considering only the insurance contracts referred

to in the complaint and declining to consider "a large number of extra-complaint documents" submitted by the parties in reviewing the grant of a Rule 12(b)(6) motion; "Even if some of these documents may satisfy the two criteria noted above, it is apparent that they reveal disputed issues of fact that cannot be resolved on a motion to dismiss.").

5. The AmTrust Policy was filed in five entries on CM/ECF. As AmTrust notes, some pages were filed out of order. Dkt. No. [6–3] at 4 n.4. The Court will refer to pages of the AmTrust policy using the corresponding docket entry and page number, rather than the page numbers included on the AmTrust Policy in its original form.

from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section I—Property.

2. Business Liability Coverage is excess over:

a. Any other insurance that insures for direct physical loss or damage; or

b. Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

3. When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so; but we will be entitled to the insured's rights against all those other insurers.

Dkt. No. [1] ¶ 32; Dkt. No. [1–8] at 6.

### 3. HEIC's Causes of Action

HEIC alleges two causes of action in the Complaint. Count I seeks a declaratory judgment that the HEIC Policy and the AmTrust Policy each provide primary coverage for Carroll and Bush with respect to the Underlying Action, such that HEIC and AmTrust each are obligated to pay an equal share of settlement and litigation expenses and such that AmTrust must reimburse HEIC for its equal share of expenses. Dkt. No. [1] at 12–13. Count II seeks a judgment awarding damages to HEIC in an amount equal to the sum of half of the settlement amount and half of the litigation defense expenses paid by HEIC with respect to the Underlying Action. Id. at 14. HEIC also seeks costs incurred in filing its lawsuit. Id.

### C. Discussion

### 1. HEIC Lacks Standing to Bring a Declaratory Judgment Action

■ AmTrust first argues that the declaratory judgment claim should be dismissed under Federal Rule of Civil Procedure 12(b)(1) because HEIC lacks standing. Specifically, AmTrust argues that the allegations of the Complaint do not state an "actual controversy" including a "real and immediate ... threat of future injury." Dkt. No. [6–3] at 7 (quoting Malowney v. Fed. Collection Deposit Grp., 193 F.3d 1342, 1347 (11th Cir. 1999)).

■ Federal courts are limited under Article III of the United States Constitution to adjudicating actual "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. The doctrine of "standing" is grounded in this case-or-controversy requirement. Ga. State Conf. of NAACP Branches v. Cox, 183 F.3d 1259, 1262 (11th Cir. 1999). To establish that a case or controversy exists, and thus that standing exists under Article III, the party invoking the power of the court must show (1) injury in fact, which is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) a causal connection between the injury and the conduct complained of; and (3) that the injury is likely to be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted). A plaintiff seeking injunctive or declaratory relief demonstrates constitutional standing at the pleading stage only if he alleges that "the defendant is likely to injure the plaintiff" in the future. Cone Corp. v. Fla. Dep't of Transp., 921 F.2d 1190, 1205 (11th Cir. 1991) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 105–09, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)); see

also Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP, 609 Fed.Appx. 972, 979 (11th Cir. 2015) (concluding that declaratory judgment claim became moot upon plaintiff insurer's payment of settlement funds because "[a] declaration could not have had any bearing on the parties' future conduct," as plaintiff sought "to recoup what it already had paid."). "A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice." Stalley ex rel. U.S. v. Orlando Regional Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008) (citation omitted).

■ Where an insurer has already paid out a claim under its policy, and seeks contribution from a co-insurer for the expense, declaratory relief concerning the priority of the insurers' policies is unavailable because such declaratory relief concerns only past events, not future injury. Malowney, 193 F.3d at 1347; Twin City, 609 Fed.Appx. at 979; Interstate Fire & Cas. Co. v. Kluger, Peretz, Kaplan & Berlin, P.L., 855 F.Supp.2d 1376, 1380 (S.D. Fla. 2012) ("Plaintiff is seeking a declaration as to past events," which "does not support a finding of an Article III case or controversy" requiring a declaratory judgment). HEIC argues that other courts have ruled upon declaratory judgment claims even when the insurance loss occurred in the past and was already paid. Dkt. No. [10] at 25. The sole case it cites, however, Pac. Indem. Co. v. Fireman's Fund Ins. Co., No. 06–6117–Civ., 2008 WL 345540 (S.D. Fla. Feb. 6, 2008), does not analyze the standing ramifications of that

decision. Furthermore, Eleventh Circuit authority supports AmTrust's arguments. Because there is no allegation of future injury, the Court **GRANTS** AmTrust's motion to dismiss Count I.

### 2. The AmTrust Policy Provides Primary, Not Excess, Coverage

AmTrust makes several arguments in support of its motion for dismissal of HEIC's equitable contribution claim. The Court will first consider AmTrust's arguments that the AmTrust Policy does not provide primary coverage and instead provides only excess coverage. The Court will then consider AmTrust's other arguments for excusal from any obligation to provide primary coverage under the AmTrust Policy.[6]

#### a. The Applicability of Graphic Arts

In determining whether the AmTrust Policy provides primary or excess coverage, each party discusses Graphic Arts Mut. Ins. Co. v. Essex Ins. Co., 465 F.Supp.2d 1290 (N.D. Ga. 2006). In Graphic Arts, the court considered whether a property management company's liability insurer should be required to contribute to settlement and litigation defense costs incurred by the liability insurer of the owner of the property the company managed in an underlying personal injury action. 465 F.Supp.2d at 1291–93. The company's insurer claimed that the policy it issued to the company was excess, not primary, while the owner's insurer argued that the company's policy was primary because its "other insurance" provision provided that the policy was excess only in certain cir-

---

**6.** The difference between primary and excess policies can be described as follows:

A "true excess" or "umbrella" policy is not intended to provide primary coverage and expressly provides nothing but excess coverage over and above certain primary coverage.... An insurer writes a primary policy with the intention of providing primary coverage; however, the insurer may use an

excess clause to avoid double payment when the insured has other insurance. An "excess" clause [or provision] provides that an insurer will pay a loss only after other available primary insurance is exhausted. St. Paul Fire & Marine Ins. Co. v. Valley Forge Ins. Co., No. CIVA.106–CV–2074–JOF, 2009 WL 789612, *4 (N.D. Ga. Mar. 23, 2009)

cumstances not present in the case.[7] Id. at 1294. The court held that the plain language of the company's "other insurance" provision compelled the holding that the company's policy was excess coverage only where the named insured had been named in another liability insurance policy "as an additional insured by attachment of an endorsement." Because the owner's policy named the company as an additional insured in the definition of "Who Is An Insured" in the body of the policy, and not "by attachment of an endorsement," the company's policy provided primary, not excess, coverage. Id. at 1294–95.

HEIC asserts that Graphic Arts is sound and on all fours with this case, whereas AmTrust attacks its reasoning. AmTrust argues that the distinction made by Graphic Arts between other insurance covering an insured because it was added by endorsement, and other insurance covering an insured because it was included as part of the definition of who the other insurance covered, arbitrarily raises form over substance and frustrates the objective of the "other insurance" provision. Dkt. No. [6–3] at 16–17; Dkt. No. [14] at 8–9. AmTrust claims that additional insureds are "customarily added to policies by 'endorsement'" but can also be added in the body of a policy; the important substantive inquiry "should be whether a party is an additional insured, not the means or mechanism by which the party is added (which is irrelevant)." Id. at 17 n.6.

Graphic Arts addressed this argument, however. First, the court observed that,

under Georgia law, where the contract language is clear and unambiguous, a court looks to the contract alone to discern the intent of the parties. 465 F.Supp.2d at 1295; White v. Kaminsky, 271 Ga.App. 719, 610 S.E.2d 542, 544–45 (2004). Even where the terms are ambiguous, the drafter of a provision should be held to the specific words he drafted, and cannot ignore their meaning to escape liability regardless of the prevailing industry custom. 465 F.Supp.2d at 1295; O.C.G.A. § 13–2–2(3), (5); see Aetna Fire Underwriters Ins. Co. v. Crawley, 132 Ga.App. 181,207 S.E.2d 666, 668 (1974) (following statutory direction to construe ambiguous contract "against the party preparing the instrument"). Based on this reasoning, the qualifier "by attachment of an endorsement" means what it says.[8]

Second, the Graphic Arts court consulted a treatise regarding "other insurance" provisions and found language providing for changes in priority of coverage due to additions of insureds "by attachment of an endorsement" was commonly understood only to refer to that class of insureds so attached. 465 F.Supp.2d at 1295 (citing Patrick J. Wielinski, et al., CONTRACTUAL RISK TRANSFER: STRATEGIES FOR CONTRACT INDEMNITY AND INSURANCE PROVISIONS § XI.C. 18–19 (International Risk Management Institute, Inc. 2006)). The mechanism by which a party is added as an additional insured to a policy does appear to matter to the drafters of insurance contracts.

The Court finds the reasoning of Graphic Arts persuasive and applicable to the

---

**7.** The provision explained that the company's policy is excess over "[a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations for which [Woodruff has] been added as an additional insured by attachment of an endorsement." Graphic Arts, 465 F.Supp.2d at 1294. This language is all but identical to the language in the "Other Insurance" provision in the AmTrust Policy.

**8.** The HEIC Policy, in addition to naming additional insureds in its "Who Is An Insured" section, also has an endorsement attached naming as an additional insured the mortgagee, assignee, or receiver of the Memphis property Sunset Investments presumably owned or owns. See Dkt. No. [1–4] at 49.

allegations in this case. It now turns to AmTrust's alternative arguments for applying that reasoning to reach a different conclusion based on the allegations of the Complaint.

### b. AmTrust's Arguments for Distinguishing *Graphic Arts*

AmTrust presents two primary reasons why Graphic Arts should not apply to its dispute with HEIC. Dkt. No. [6–3] at 15–17.[9]

■ First, AmTrust argues that it insured Carroll for a business described as a real estate investment company, not a property management company. AmTrust contends that this places AmTrust on different footing than the insurer of the company in Graphic Arts, who was fully aware that it was insuring a property management company and so was aware that its policy would cover risk at additional locations. AmTrust further relies on the description of Carroll in the declarations and the premiums Carroll paid for coverage to suggest its lack of intent to cover risks of properties managed by Carroll. Dkt. No. [6–3] at 10, 16.

The AmTrust Policy, however, contains no such geographical limitation of coverage to Carroll's Atlanta headquarters, either in the body of the Policy or in any endorse-

ment. HEIC, arguing that the AmTrust Policy is not so limited, refers to an example of such an endorsement in its Policy concerning coverage for claims involving bodily injury, property damage, personal injury, or advertising injury. See Dkt. No. [10] at 19–20; Dkt. No. [1–4] at 36 ("Liability Coverage—Designated Premises" endorsement attached to HEIC Policy).

The Court does not read the AmTrust Policy to disavow coverage of risk outside the four walls of Carroll's Atlanta headquarters as AmTrust contends. Section II. A.1.b provides that the AmTrust Policy applies "(1) To 'bodily injury' . . . if: (a) The 'bodily injury' . . . is caused by an 'occurrence' that takes place in the 'coverage territory,'" during the policy period, and that no insured or designated employee of an insured knew of the injury prior to the policy period. Dkt. No. [1–7] at 23. AmTrust does not contest that an "occurrence" caused "bodily injury" resulting in the death at issue in the Underlying Action during the policy period without any insured's foreknowledge. The "coverage territory" is defined in Section II.F.4 to include the United States of America, among other territories and parts of the world. Dkt. No. [1–8] at 1. Nothing in the language of the AmTrust Policy concerning liability coverage avoids coverage of liability incurred by Carroll's business activities.

9. AmTrust asserts two additional reasons for distinguishing Graphic Arts. The Court addresses AmTrust's argument as to notice of the death giving rise to the Underlying Action and of the Underlying Action itself in Section III.C.3.c infra. AmTrust also asserts that the AmTrust Policy may not provide primary coverage to Carroll and Bush at all in light of their status as additional insureds under the HEIC Policy. Dkt. No. [6–3] at 17 ("[T]here is no hint in the AmTrust [P]olicy that it is anything other than excess if there is another applicable policy."). Neither the declarations nor the body of the AmTrust Policy indicate that the AmTrust Policy was intended or de-

signed to serve only as excess coverage. See Dkt. Nos. [1–5], [1–6], [1–7], [1–8], [1–9]; The Am. Cas. Co. of Reading v. MAG Mut. Ins. Co., 185 Fed.Appx. 921, 926–27 (11th Cir. 2006) (describing language in a true excess or "umbrella" policy). Further, Paragraphs 2 and 3 of the "Other Insurance" provision of the AmTrust Policy cabin the situations in which the Policy is deemed excess and refers to "any *other* primary insurance" that may provide coverage. Dkt. No. [1–8] at 6. These features indicate that the AmTrust Policy provides primary coverage unless the "Other Insurance" provision applies.

■ Second, AmTrust emphasizes the endorsement contained in HEIC's Policy altering the "Who Is An Insured" section. AmTrust argues that endorsement, GL–914, "Limited Liability Company" (see Dkt. No. [1–4] at 37), repeals the language declaring "Who Is An Insured" under the HEIC Policy and replaces it with new language. AmTrust concedes that "the insuring language relating to the inclusion of a real estate manager as an additional insured is unchanged," but relies on the perceived elevation by Graphic Arts of form over substance in arguing that the endorsement nonetheless "added" Carroll as an additional insured by attachment of an endorsement because it eliminated and superseded the original language in the body of the policy. Dkt. No. [14] at 7–8. AmTrust argues that AmTrust's Policy, therefore, should be deemed excess and not primary. Id. at 8–9.

In construing a contract under Georgia law, courts are to give a contract term its usual and common signification absent evidence that the term is a term of art, has technical or industry-specific meaning, or has another meaning indicated within the four corners of the contract. Archer W. Contractors, Ltd. v. Estate of Pitts, 292 Ga. 219, 735 S.E.2d 772, 777 (2012) (citing O.C.G.A. § 13–2–2(2)). A dictionary is useful evidence of the common meaning of a term. Id. One useful definition of "add" is "to join or unite so as to increase in size, quantity, quality or scope" or "to say or write further." THE AMERICAN HERITAGE COLLEGE DICTIONARY 15 (3d ed. 1997).

With respect to members of an insured limited liability company, GL–914 did "add" insureds to the HEIC Policy; prior

to attachment of the endorsement, they were not covered, and after attachment of the endorsement, they were. In contrast, Carroll, a property manager of real estate owned by Sunset Investments, was not "added" to the HEIC Policy as an insured when GL–914 attached. Carroll was an additional insured before attachment under the "Who Is An Insured" provision in the body of the Policy. That the original "Who Is An Insured" language was repealed and replaced by identical language in the endorsement altered the Policy, but that specific language did not "join or unite so as to increase in size, quantity, quality or scope" or append anything "further" to the entities insured. GL–914 was attached and certain members of a limited liability company were added as additional insured, but Carroll's status did not change.

c. There is No Rule Requiring an Insurance Policy with a More Specific Provision to Provide Primary Coverage While a More General Policy Only Provides Excess Coverage

■ AmTrust also contends that the AmTrust Policy was intended to cover Carroll's property and liability risks only at its Atlanta headquarters, and not any risk of liability incurred at the Apartments. Dkt. No. [6–3] at 10. AmTrust applies the principle that "where one policy clearly addresses the specific risk and the other does not, the former is primary," and by implication, the latter is excess. Id. at 11. Because the HEIC Policy specifically mentioned the location of the Apartments (in Cleveland, Mississippi), AmTrust claims the HEIC Policy should be deemed the sole primary policy providing coverage at that location. Dkt. No. [14] at 6–7.[10]

---

10. For its distinction of the two policies as specific and general, AmTrust appears to rely on the assertion that the AmTrust Policy only charged a $2 premium for liability coverage, whereas the liability premium for coverage of

the Apartments in the HEIC Policy was much larger. Dkt. No. [6–3] at 4 n.3 (citing Dkt. No. [6–2], AmTrust Businessowners Insurance Proposal, Ex. 2 to Motion to Dismiss, at 6), 6 n.5 (citing Dkt. No. [1–4] at 5). Neither party

 HEIC responds that while Am-Trust's chosen principle may apply in other jurisdictions, it is inapplicable to their dispute under Georgia law. HEIC cites Home v. Great Am. Ins. Co., 109 Ga.App. 24, 134 S.E.2d 865, 868 (1964) for a contrary rule, providing that "blanket policies of insurance pro rate with specific policies and thus constitute concurrent or other insurance." Dkt. No. [10] at 23. AmTrust replies that Hartford Steam Boiler Inspection, etc., Co. v. Cochran Oil Mill & Ginnery Co., 26 Ga.App. 288, 105 S.E. 856 (1921) supports its assertion that a specific policy should be deemed to cover the loss, rather than a more general policy. Dkt. No. [14] at 7.

Assuming for purposes of argument that the HEIC Policy covers liability risks specific to the premises of the Apartments and that the AmTrust Policy is a "blanket" liability policy, the Court finds that Home provides the correct rule to apply. Both Home and S. Home Ins. Co. v. Willoughby, 124 Ga.App. 162, 182 S.E.2d 910 (1971) found reasons to confine Hartford to its facts. Home, 134 S.E.2d at 869 ("the insurance policies involved in that case [Hartford] contained provisions limiting liability to the excess over any specific insurance carried by the insured"); Willoughby, 182 S.E.2d at 913 ("one policy [in Hartford] was an employees' personal injury liability policy while the other was primarily a property damage policy"). The policies at issue here are not as different as those in Hartford, in which "the nature of the risks and duties assumed, as well as the subject-matter of the insurance, [wa]s widely di-

verse." Hartford, 105 S.E. at 857. And as discussed infra, principles of equity under Georgia law favor pro rata sharing of losses among primary insurers. The Court thus rejects AmTrust's argument that a more specific coverage clause in the HEIC Policy should cause that policy to bear the responsibility of primary coverage alone.

For the reasons stated above, the Court concludes that the AmTrust Policy provides primary coverage, concurrent with the HEIC Policy, for liability for the Underlying Action.

### 3. AmTrust's Other Arguments for Excusal from Contribution either Fail or Involve Questions of Fact

#### a. The AmTrust Policy Covers Contribution for Costs of Litigation

 AmTrust also argues that, even if the excess provision of the AmTrust Policy is deemed not to control under the alleged circumstances and its Policy is deemed to provide primary coverage, HEIC cannot recover any portion of its litigation expenses incurred in defending the Underlying Action. Dkt. No. [6–3] at 13; Dkt. No. [14] at 10–11. AmTrust observes that the AmTrust Policy "Other Insurance" provision has no "method of sharing" provision, unlike the HEIC Policy and both policies at issue in Graphic Arts. Dkt. No. [6–3] at 13, 17; Dkt. No. [1–8] at 6. AmTrust claims that because its Policy lacks a "method of sharing" provision, no sufficient contractual arrangement exists between the HEIC Policy and the AmTrust Policy allowing the sharing of litigation defense costs.[11] Dkt. No. [14] at 11.

provides context for this information or authority concerning its relevance to the understanding of the material language of the insurance contracts. See also Dkt. No. [10] at 19, 22. For purposes of resolving the motion to dismiss, the Court does not consider the amount or designation of premiums paid by the parties' respective insureds.

11. AmTrust asserts that the AmTrust Policy has no "method of sharing" clause "because it is an excess policy as to liability. The policy was rated and the premium charged was for very limited liability exposure at an Atlanta office location." Dkt. No. [6–3] at 17. For the reasons stated above in footnote 9, the Court rejects this argument with regard to the motion to dismiss.

AmTrust relies on Barton & Ludwig v. Fidelity & Deposit Co. of Md., 570 F.Supp. 1470 (N.D. Ga. 1983), where the court found that an insurer is not entitled to contribution for defense of its own insured absent some contractual arrangement among the insurers to the contrary. Dkt. No. [6–3] at 13. HEIC cites to St. Paul Fire & Marine Ins. Co. v. Valley Forge Ins. Co., No. CIVA.106–CV–2074–JOF, 2009 WL 789612 (N.D. Ga. Mar. 23, 2009), and argues that the costs should be shared on a *pro rata* basis. Dkt. No. [10] at 16–17.

In St. Paul, this Court considered Barton, Graphic Arts, and Georgia case law concerning contribution in indemnity among insurers. 2009 WL 789612 at *8–10. Rather than rely on the congruence of the "method of sharing" provisions the Graphic Arts court found created a sufficient contractual arrangement, the St. Paul court found "the holdings of the Georgia courts with respect to contribution in indemnity [were] the greatest predictors of Georgia law regarding the right to contribution for defense costs," and "the principles of equity that underlie the rule of contribution with respect to the ultimate loss apply equally to the costs to defend." Id. at *10. The court subsequently allowed a contractor's insurer to pursue a cause of action for contribution of defense costs from a subcontractor's insurer. Id.

The Court agrees with the analysis in St. Paul that Georgia law supporting contribution *pro rata* among insurers with concurrent primary insurance policies applies equally to "the ultimate loss" and to "the costs to defend." Accordingly, HEIC properly states an equitable contribution claim for its litigation defense costs as well as for its settlement expenses. See also MAG Mut. Ins. Co., 185 Fed.Appx. at 925 (citing Georgia law) ("[W]hen two insurance policies covering the same risk both contain 'other insurance' clauses that cannot be reconciled, those clauses cancel

each other out and the insurers share in liability pro rata.").

b. The Voluntary Payment Doctrine Does Not Excuse AmTrust

■ AmTrust next contends that HEIC's decision to settle the Underlying Action instead of carrying on to trial should be considered a voluntary payment, precluding recovery of any contribution from a co-insurer. Dkt. No. [6–3] at 14. As AmTrust acknowledges, such settlements usually are not considered "voluntary payments" when the non-paying insurer decides not to participate in the settlement. Nonetheless, AmTrust posits that because it never consented to a settlement and HEIC never explained its rationale for settling the Underlying Action, it should not have to contribute to that settlement. Id. at 14–15. But AmTrust's argument is foreclosed by cases the Court finds persuasive and which were decided on facts similar to those alleged here.

In Arrow Exterminators, Inc. v. Zurich Am. Ins. Co., 136 F.Supp.2d 1340 (N.D. Ga. 2001), a termite extermination company, Arrow, filed several claims against two of its previous commercial liability insurers, Zurich and TIG. Arrow submitted claims of termite damage to Zurich that arose after Zurich's policies had lapsed (and TIG's policies had come into effect), but that likely concerned damage that took place during Zurich's effective period of coverage. Zurich nonetheless declined to defend the claims. When Arrow submitted those and other claims to TIG, it paid claims up to its aggregate coverage limit without (Arrow alleged) properly examining whether some of the claims it paid should have been covered by Zurich. Arrow Exterminators, 136 F.Supp.2d at 1344–45.

One of Zurich's arguments why it should not be required to contribute to TIG's payments was that TIG made payments

voluntarily, and Zurich's insurance policies precluded coverage for payments made without its authorization. Id. at 1352–53. The court found that Georgia law forbade Zurich from first refusing to contribute to its insured loss, then using that refusal to avoid contribution to a co-insurer's payment for that loss.

> The defendant ... having thrust sole responsibility upon the plaintiff insured and the co-insurer, cannot escape its obligations to reimburse the plaintiff on the ground that it was not a party to the settlement. To hold otherwise would permit a co-insurer which disavowed its obligations to the insured to escape its duties without injury because of the performance of those duties by the insured in cooperation with the co-insurer.

Id. (quoting Cont'l Ins. Co. v. Fed. Ins. Co., 153 Ga.App. 712, 266 S.E.2d 351, 353 (1980)). The court concluded that, "[h]aving decided not to participate in the settlement of these claims, Zurich cannot now escape its obligations by saying that TIG settled the claims without its authorization." Id. (citing Cont'l Ins. Co., 266 S.E.2d at 353).

Likewise, AmTrust received notice of the lawsuit from HEIC in October 2014, a month before Carroll was formally named in the Underlying Action to correct a misnomer.[12] AmTrust, however, did not formally respond to HEIC's request for contribution until after receiving notice of an impending settlement and after the actual payment of the settlement. Like Zurich, AmTrust had notice of its potential responsibility to provide for defense of an action against its insured well before settlement occurred, yet did not elect to participate. Georgia courts have expressed concern about "permit[ting] a co-insurer which disavowed its liability and refused to perform its obligations to the insured to escape its duties without injury." Cont'l Ins. Co., 266 S.E.2d at 353. The invocation of an insurer's refusal to participate in the defense and settlement of an action as a reason to avoid contribution to that settlement directly implicates that concern. This argument does not support dismissal.

c. Whether AmTrust Received Sufficient Notice of the Occurrence and of the Underlying Action, and Whether It Waived Its Rights to Assert a Defense of Notice, are Questions of Fact

▇▇ AmTrust also argues that the terms of the AmTrust Policy requiring timely notice from an insured, and not from a co-insurer or another party, relieve it of responsibility to contribute to the settlement and the litigation defense. AmTrust notes that the defendants in the Underlying Action tendered only to HEIC and not to AmTrust. See Dkt. No. [1] ¶¶ 19–22. According to this logic, because notice of the incident or claim is a condition precedent to coverage under Georgia law, coverage under the AmTrust Policy was never triggered and HEIC therefore cannot seek contribution. Dkt. No. [6–3] at 12–13; Dkt. No. [14] at 2–3 (citing Dkt. No. [1–8] at 1, 33).

▇▇ Compliance with a notice provision in a liability insurance contract is a condition precedent to coverage under Georgia law where the notice provision "expressly states that a failure to provide such notice will result in a forfeiture of the insured's rights or uses language which otherwise clearly expresses the intention that the notice provision be treated as a

---

12. AmTrust appears to suggest that the correction of the misnomer to name its insured as a defendant was made as part of a scheme by HEIC and its attorneys in the Underlying Action to obtain proceeds from the AmTrust Policy. See Dkt. No. [6–3] at 15; Dkt. No. [14] at 4. Such questions are questions of fact, not of law, and are not appropriately considered when resolving a motion to dismiss.

condition precedent." State Farm Fire & Casualty Co. v. LeBlanc, 494 Fed.Appx. 17, 21 (11th Cir. 2012) (quoting Res. Life Ins. Co. v. Buckner, 304 Ga.App. 719, 698 S.E.2d 19, 27 (2010)). The notice provisions in the AmTrust Policy, found at Section II.E(2), read as follows:

E. Liability and Medical Expenses General Conditions

. . .

2. *Duties in the Event of Occurrence, Offense, Claim Or Suit*

a. *You must see to it* that we are notified *as soon as practicable* of an 'occurrence' or an offense which may result in a claim.

. . .

b. If a claim is made or 'suit' is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us *as soon as practicable.*

*You must see to it* that we receive written notice of the claim or "suit" *as soon as practicable.*

Dkt. No. [1–8] at 33 (emphasis added). Georgia courts have treated language like that appearing in the notice provisions of the AmTrust Policy, as conditions precedent. LeBlanc, 494 Fed.Appx. at 21 (citing Georgia appellate courts treating "you must see to it" and "Duties in the Event of ... Claim or Suit" as language "express[ing] the intention that the notice provisions be treated as conditions precedent to coverage"), 22 (citing Georgia appellate courts treating "as soon as practicable" as having the same meaning as "prompt" and "immediate").

▪ The AmTrust Policy notice provisions should be treated as conditions precedent to coverage under Georgia law. Further, where notice is a condition precedent,

the insurer need not show it was prejudiced by that the failure to receive timely notice. Plantation Pipe Line Co. v. Stonewall Ins. Co., 335 Ga.App. 302, 780 S.E.2d 501, 510 (2015) ("[W]hen specified notice is a valid condition precedent to coverage, an insurer is not required to show actual harm from a delay in notice in order to justify a denial of coverage based on such failure of a condition precedent."), *recon. denied* (Dec. 15, 2015). If AmTrust did not receive notice of the allegedly wrongful death or of the Underlying Action that complied with the notice provisions in its Policy, AmTrust has a defense to HEIC's contribution claim as a matter of law.

AmTrust raises multiple reasons why the alleged notice was insufficient. AmTrust first asserts that notice from HEIC, rather than from its insureds, did not trigger coverage under its Policy. HEIC asserts that whether the insured or another party gave notice to AmTrust is irrelevant, notwithstanding the terms of the AmTrust Policy.

In Hathaway Dev. Co. v. Am. Empire Surplus Lines Ins. Co., 301 Ga.App. 65, 686 S.E.2d 855 (2009), upon which HEIC relies, the court considered the defendant insurer's argument that it never received notice of its insured's claim directly from the insured, a subcontractor, and so was not liable under its policy. Hathaway, 686 S.E.2d at 859. The court disagreed, finding that notice to the defendant insurer from the general contractor of its claim against the subcontractor was sufficient. Id. at 860 ("It makes no difference who gives the notice, so long as a reasonable and timely notice is given the company and it has actual knowledge of the pendency of a claim or suit.") (quoting Stonewall Ins. Co. v. Farone, 129 Ga.App. 471, 199 S.E.2d 852 (1973)). This is because requiring notice of a claim before coverage is activated is not a matter of contractual fulfillment, but of

allowing the insurer to gather information about the claim and the incident and to prepare either to defend the suit or to settle it. Id. AmTrust does not respond to this argument, and insists that notice must have come from an insured and no such notice is alleged.

The Court concludes that Georgia law does not require notice of a claim to come only from the insured to satisfy notice as a condition precedent to coverage. Under Georgia law, then, notice of the Underlying Action from HEIC was sufficient to trigger coverage if its notice was reasonable and timely.

AmTrust further argues that the notice alleged was untimely. HEIC disagrees, as it provided notice of the Underlying Action to AmTrust a month before Carroll had been correctly named as a defendant in the lawsuit. See Dkt. No. [1] ¶¶ 10, 22. As AmTrust points out, this may satisfy notice regarding the Underlying Action, but does not address AmTrust's concern that it did not receive notice about the wrongful death at the center of the Underlying Action until more than a year after it happened. Dkt. No. [14] at 2–3; see also Dkt. No. [1–1] ¶ 9 (alleging that the wrongful death at the Apartments occurred on September 3, 2013). The Complaint does not allege when AmTrust first learned of the wrongful death; the first alleged notice provided by anyone to AmTrust is HEIC's initial demand for contribution on October 8, 2014. Dkt. No. [1] ¶ 22. The AmTrust Policy specifically provides that AmTrust must receive notice of the "occurrence" "as soon as practicable." Dkt. No. [1–8] at 33.

AmTrust cites to several cases applying Georgia law and holding that a delay of less than the thirteen months at issue here does not satisfy, as a matter of law, a notice provision like the one included in the AmTrust Policy. See, e.g., LeBlanc, 494 Fed.Appx. at 23 (insureds' four-month delay in notifying insurer of lawsuit

against insureds unreasonable under Georgia law absent a valid excuse); Kay–Lex Co. v. Essex Ins. Co., 286 Ga.App. 484, 649 S.E.2d 602, 608 (2007) (collecting cases holding that unexcused delays of eight to twelve months were unreasonable under Georgia law and holding that twelve-month delay where notice was to be provided "as soon as practicable" was unreasonable); Diggs v. S. Ins. Co., 172 Ga.App. 37, 321 S.E.2d 792, 793 (1984) (delay of three months between filing of lawsuit and notice to insurer unreasonable as a matter of law). Because notice of the occurrence leading to the Underlying Action is required to trigger coverage by AmTrust, and thus to permit HEIC to press its equitable contribution claim, the Complaint appears to omit a factual allegation critical to HEIC's claim.

HEIC, however, argues that AmTrust waived its right to assert a defense to coverage of untimely notice. This is because AmTrust failed to raise a notice defense both upon receiving HEIC's demand for contribution in October 2014 and in its letter declining to contribute to HEIC's expenses in January 2015. Dkt. No. [10] at 23–24. HEIC relies on Hoover v. Maxum Indem. Co., 291 Ga. 402, 730 S.E.2d 413 (2012), for the principle that "an insurer waives its right to assert a late notice defense when it does not deny coverage on that basis when first denying coverage." Dkt. No. [10] at 23 (citing Hoover). AmTrust counters that Hoover does not apply here because it concerned the appropriate circumstances for an insurer to exercise a reservation of rights in light of needed protections for insureds requiring personal injury coverage. Because no insured ever sought coverage from AmTrust and because no reservations of rights are alleged to have been exercised in this case, AmTrust argues that this Court should not presume that the Georgia Supreme Court would extend Hoover to

the circumstances alleged here. Dkt. No. [14] at 4–6.

The Court concludes that the reasoning of Hoover applies to this case. The Hoover court found that the insurer had ample opportunity during the underlying litigation to notify its co-insurer of its intent to assert an untimely notice defense, but never did so, and consequently waived the defense. 730 S.E.2d at 418. The court found that the court below had erred when it failed to construe the notice provision against the insurer, observing that "Georgia courts do not favor forfeitures in construing insurance contracts" and "strictly construe provisions of that benefit the insurer," such that "even small circumstances show waiver by the insurance company." Id. (citations and internal quotations omitted).

That the claim for coverage in Hoover came from the insured, rather than the co-insurer, has no bearing on the insurer's opportunity to examine the propriety of an untimely notice defense and to communicate that defense to the co-insurer. The allegations of the Complaint, read in the light most favorable to the plaintiff, permit the reasonable inference that AmTrust waived its notice argument, either by not formally responding to HEIC's request for contribution until months after it received notice of the Underlying Action, or by not including a notice defense when it ultimately did respond (after notice that HEIC intended to settle the Underlying Action) and declined to contribute not due to untimely notice, but because the "Other Insurance" provision of the AmTrust Policy caused its coverage to be excess.

AmTrust raises a plausible argument that the allegations fail to assert that AmTrust received timely notice of the occurrence giving rise to the insured's claim, as required by the AmTrust Policy to trigger coverage. This imperils HEIC's cause of action for contribution for settlement and defense of its co-insured's claims. HEIC's argument that AmTrust waived its notice defense also is plausible. Both of these questions, of notice and of waiver, are questions of fact. MXenergy, Inc. v. Ga. Pub. Serv. Comm'n, 310 Ga.App. 630, 714 S.E.2d 132, 137 (2011) ("waiver, like notice, is a question of fact") (citations omitted); State Farm Fire & Cas. Co. v. Walnut Ave. Partners, 296 Ga.App. 648, 675 S.E.2d 534, 538 (2009) (under Georgia law, "[w]hether an insured gave an insurer timely notice of an event or occurrence under a policy generally is a question for the factfinder.") (footnote omitted). The Court cannot determine from the allegations and the insurance contracts attached to the Complaint whether AmTrust actually did receive any notice—formal or otherwise—of the allegedly wrongful death central to the Underlying Action within a time frame that is reasonable as a matter of law. Nor can the Court determine whether HEIC has a justifiable excuse for any unreasonably untimely notice, or whether AmTrust actually waived its notice concerns. As a result, the Court cannot say that HEIC has failed to state a plausible claim. AmTrust is free to raise its notice defense in its Answer, and the parties may seek to establish the applicability or waiver of the defense after engaging in discovery.

Finally, AmTrust briefly argues that it cannot be held responsible for any litigation costs incurred between commencement of the Underlying Action in November 2013 and its receiving notice that Carroll would become a named defendant in the Underlying Action in October 2014. Dkt. No. [14] at 11. In Elan Pharm. Research Corp. v. Employers Ins. of Wausau, 144 F.3d 1372 (1998), the Eleventh Circuit considered a case in which a de-

fendant incurred litigation defense expenses prior to tendering notice of the claim against it to its insurer. Id. at 1381. The Court applied Georgia case law and held that the insurer was not liable for pre-tender litigation expenses. Id. at 1382. Assuming without deciding that the rule deployed in Elan applies here, whether and to what extent AmTrust is liable for litigation defense costs would turn on when it received actual notice of the occurrence leading to the Underlying Action. As this is an issue of fact, the Court reserves judgment as to the applicability of this argument to cut off any liability of AmTrust to contribute to HEIC's defense costs.

## IV. CONCLUSION

For the above stated reasons, AmTrust's Motion to Dismiss [6] is **GRANTED IN PART and DENIED IN PART**. Specifically, AmTrust's motion to dismiss is **GRANTED** with regard to HEIC's cause of action for a declaratory judgment (Count I). AmTrust's motion to dismiss is **DENIED** with regard to HEIC's cause of action for equitable contribution (Count II). HEIC's Cross–Motion for Judgment on the Pleadings [11] is **DENIED**.

**IT IS SO ORDERED** this 29th day of March, 2016.